BOCHETTO & LENTZ, P.C.
By:     George Bochetto, Esquire
        David P. Heim, Esquire
        Bryan R. Lentz, Esquire
        Kean C. Maynard, Esquire
Identification Nos. 27783, 84323, 71383, 327794
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900                          Attorneys for Plaintiff
(215) 735-2455 fax
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com
blentz@bochettoandlentz.com
kmaynard@bochettoandlentz.com

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BETH ANN McCAFFERY : <br> 139 Cheswold Lane : <br> Haverford, PA 19041 : <br> : <br>       Plaintiff, : <br> : <br>     v. : <br> : <br> NEW YORK UNIVERSITY : <br> SCHOOL OF LAW : <br> 70 Washington Square South : <br> New York, NY 10012 : <br> : <br>     and : <br> : <br> NEW YORK UNIVERSITY : <br> 70 Washington Square South : <br> New York, NY 10012 : <br> : <br>     and : <br> : <br> PATRICIA CUMMINGS : <br> 405 Round Rock Avenue : <br> Round Rock, TX 78664 : <br> : <br>     and : <br> : | NO. 2025-01954 <br><br><br> JURY TRIAL DEMANDED |

JOHN DOE                                          :
                                                  :
            and                                   :
                                                  :
JANE DOE                                          :
                                                  :
                    Defendants.                   :
_____           :

<u>AMENDED COMPLAINT</u>

Plaintiff, by and through her undersigned counsel, files the following  Amended Complaint

for damages against New York University School of Law, New York University, Patricia

Cummings, John Doe and Jane Doe ("Defendants") and in support thereof avers as follows:

<u>NATURE OF THIS ACTION</u>

1.      On June 22, 1954, Philadelphia Police Officer Francis McCaffery was on duty

patrolling the area near Connie Mack Stadium.

2.      As McCaffery approached the vicinity of 22nd and Sedgley Street, he encountered

two men attempting to steal from a vehicle belonging to a staff member of the Philadelphia A's

professional baseball team.

3.      When confronted, the thieves turned on Officer McCaffery. One of them drew a

revolver and shot the 37-year-old officer. While McCaffery lay wounded on the ground his

assailants stole his service weapon, hijacked a taxi, and fled the state.

4.      Both offenders, later identified as federal convicts, were subsequently linked to a

murder in another state.

5.      Although McCaffery survived the shooting, he and his family bore the physical and

emotional scars for the remainder of his life. His service and sacrifice left a lasting impact on his

children and grandchildren, shaping their values for generations.

6.     In the fall of 2001, McCaffery's granddaughter, Beth Ann McCaffery ("Beth"), followed in his footsteps of public service. She raised her right hand and swore the oath of office as an Assistant District Attorney in Philadelphia, the same city where her grandfather had been wounded while protecting the public.

7.     That oath—"I do solemnly swear (or affirm) that I will support, obey, and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity."—reflected both Beth's and her grandfather's character.

8.     For 13 years, Beth faithfully carried out her duties, earning the respect and admiration of her colleagues, opposing attorneys and the Judges in front of whom she regularly appeared.

9.     She worked in multiple units, working her way up to the prestigious homicide unit where she prosecuted approximately 50 to 75 murder cases.

10.     In June of 2014, Beth left the District Attorney's Office to dedicate herself to raising her children in their early years.

11.     By early 2018, she was a mother of three young boys, all under the age of five. Her career as a prosecutor in Philadelphia had become a proud chapter in her past and defines her professional character—a character of service and justice.

12.     But in May of that year, everything changed. Beth's legacy was twisted, rewritten to cast her as a villain, accused of committing the gravest sin in America's justice system: the intentional persecution of an innocent man.

13.     Defendant Patricia Cummings was employed by the Philadelphia District Attorney's Office under District Attorney Larry Krasner.

14.     On May 15, 2018, Cummings drafted—and Krasner's office filed—a motion to abandon – or nolle pros – murder charges in a case prosecuted by Beth McCaffery a decade earlier in 2008 ("the Cumming's Motion).

15.     Though Beth was not named in the motion, the media quickly identified her, and the resulting coverage vilified her, dragging her name through the mud.

16.     In the motion, Cummings accused Beth of "egregious misconduct," "hiding evidence," and "violation of the law." By explicitly alleging that Beth concealed evidence and broke the law, Cummings made a direct and unequivocal accusation that Beth had committed criminal acts.

17.     Six years later, in March 2024, NYU and Patricia Cummings—now employed by NYU published a report titled Prosecutorial Misconduct in the Philadelphia District Attorney's Office ("The Zimroth Report").

18.     The Zimroth Report includes a section devoted to the proceedings against Dontia Patterson —beginning with the investigation and arrest, continuing through two jury trials, and concluding with his exoneration.

19.     As part of that narrative, the Report republished the false claims of prosecutorial misconduct from Cummings' Motion.

20.     Unlike the court filing from 2018, the NYU report names Beth twice--going so far as to highlight her name in bold print: "ADA Beth McCaffery."

21.     Shortly after the NYU report was published, it was featured at the Peter L. Zimroth Center on the Administration of Criminal Law's annual conference, which was attended by hundreds of lawyers and extensively promoted online by NYU.

22.     At the event, panelist Patricia Cummings and keynote speaker Larry Krasner praised the report for exposing allegedly unethical and corrupt prosecutors.

23.     The defamatory per se accusations against Beth originated entirely from false claims made in a motion authored by Patricia Cummings and filed by the Philadelphia District Attorney's Office in 2018, as well as Cummings' purposely false descriptions of the Patterson prosecutions in the Zimroth Report itself.

24.     NYU republished these claims as part of the knowingly false report of the proceedings against Dontia Patterson, despite being fully aware—based on Cummings's own personal knowledge—that the allegations lacked any factual basis.

25.     In addition to Cummings' own knowledge that the Zimroth Report's portrayal of the Patterson case was false, the public record—including three separate, publicly available court transcripts, the direct appeal filings, and the Post Conviction Relief Act ("PCRA") filings, all of which were reviewed by the Defendants —materially contradicts both the claims set forth in the Cummings Motion and the broader narrative advanced in the Zimroth Report.

26.     No one at NYU made any effort to independently verify the allegations in the Zimroth report and, to the contrary, ignored contradictory evidence and information.

27.     They relied in large part, if not entirely on Cummings—even though multiple judges had previously found that several claims she made in her capacity as an attorney were either "unreliable" or lacked candor.

28.     This reckless disregard for the truth underscores NYU's complicity in perpetuating a false and damaging narrative.

29.     Despite a Philadelphia court having declared the accusations false and "maliciously intended," the NYU report remains publicly available online, continuing to inflict damage.

30.     Backed by NYU and widely circulated throughout the legal community for the express purpose of "publicly shaming" Beth and other prosecutors, the report has inflicted a direct and devastating blow to Beth's personal and professional reputation. Its false allegations continue to cast a long, damaging shadow over her name.

31.     The emotional and reputational damage caused by Cummings and the NYU report was entirely foreseeable and nothing short of catastrophic. They shattered Beth's sense of self and left a lasting scar that no apology or retraction could ever undo.

<u>PARTIES</u>

32.     Plaintiff, Beth Ann McCaffery ("Beth"), is an adult individual residing at 139 Cheswold Lane, Haverford, Pennsylvania 19041.

33.     Defendant, Patricia Cummings ("Cummings"), is an adult individual and attorney with an active license in Texas and an inactive license in Pennsylvania.  Cummings currently resides in the State of Texas at 405 Round Rock Avenue, Round Rock, TX 78664.

34.     Defendant, New York University School of Law ("NYU Law"), is a private, academic, nonprofit entity specializing in legal education and research, which functions as an academic subdivision of New York University.  Established in 1835, NYU Law is the oldest law school in New York City and one of the oldest in the United States.  NYU Law is located at 70 Washington Square South, New York, NY 10012.

35.     Defendant, New York University ("NYU"), is a private not-for-profit research university, founded in 1831 and chartered by the New York State Legislature.  NYU has an estimated $6.5 billion endowment, which is among the top 25 largest university endowments in the United States.  NYU is located at 70 Washington Square South, New York, NY 10012.

36.    The John and Jane Doe Defendants are yet unknown individuals and/or entities who may have worked and/or conspired with the Defendants in maliciously defaming Beth.

<u>JURISDICTION AND VENUE</u>

37.    This Court has specific personal jurisdiction over Defendants because each of them had specific contacts with Pennsylvania related to the claims set forth herein, including Cummings prior work for the Philadelphia District Attorney, as well as her and NYU's repeated communications with and presence at the Philadelphia District Attorney's Offices in "researching" and preparing the false and defamatory NYU Report.  Defendants further directed their tortious and defamatory activity at Plaintiff with the intent of harming Plaintiff in Pennsylvania.

38.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

39.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this Judicial District, , where Beth was born and raised.  Such occurrences include the publication of the defamatory statements from the NYU Report in this Judicial District, where the defamatory NYU Report was read and understood by Beth's friends, neighbors, family members and/or colleagues. Additionally, Defendants and agents of Defendants were at relevant times physically present in this Judicial District while "researching" the defamatory Zimroth Report.  Defendants also obtained information directly from the Philadelphia District Attorney's Office related to the Zimroth Report.

<u>STATEMENT OF FACTS</u>

*Krasner's So-called "Progressive" Ideology*

40.    In January of 2018, Lawrence Krasner entered office as the new District Attorney for the City of Philadelphia.

41.    Krasner campaigned on a progressive platform that denounced an entire generation of Philadelphia prosecutors as dishonest actors complicit in a corrupt and racist system that routinely prosecuted and imprisoned the innocent.

42.    He advanced this sweeping narrative to serve his political agenda, with no regard for the reputations of hundreds of dedicated attorneys like Beth, whose integrity was long respected within the legal community.

43.    Krasner pledged to dismantle their work and actively sought to overturn convictions secured by his predecessors.

44.    Once he was elected, Krasner publicly likened former Assistant District Attorneys—such as Plaintiff—to "war criminals."

45.    He referred to the Pennsylvania Office of Attorney General, where many former Philadelphia prosecutors have continued their public service, as "Paraguay"—a historically charged reference to the South American country known for sheltering Nazi war criminals who orchestrated and committed acts of genocide during the Holocaust.

46.    Krasner hired Defendant Patricia Cummings to lead the newly designed Convictions Integrity Unit ("CIU").

47.    As detailed herein, the true purpose of the re-vamped CIU—beyond serving as a vehicle to elevate Krasner's public persona—was to systematically target former prosecutors with unfounded allegations of prosecutorial misconduct, in furtherance of a politically motivated campaign to discredit his predecessors and rewrite the history of the Office.

48. Cummings, as the Chief of CIU, fully agreed with and worked deliberately to advance this agenda.

49. In February 2018, just one month after Larry Krasner was sworn in as District Attorney, Patricia Cummings identified the Conviction Integrity Unit's first opportunity to advance Krasner's agenda in *Commonwealth v. Dontia Patterson*.

50. Patterson was convicted of first-degree murder and was, at the time, serving a life sentence.

51. Patterson was tried twice for murder charges. Beth prosecuted the first murder trial in 2008, which resulted in a hung jury. In 2009, prosecutor Richard Sax ("Sax") again prosecuted Patterson which resulted in a guilty verdict.

52. Krasner and Cummings viewed the Patterson case as a convenient opportunity for a high-profile first exoneration. It was positioned at a stage in the appeals process that allowed for a swift resolution early in Krasner's first term.

53. Just as conveniently, the prosecutor who obtained the conviction—Sax—was a longtime nemesis of Krasner, making the case a chance not only to reverse a conviction but to publicly attack and discredit someone Krasner (and therefore Cummings) had long sought to exact revenge upon.

54. Since two prosecutors were involved in the case, Krasner and Cummings recognized that to go after Sax, they would also have to attack Beth—despite having no personal or professional history with her, and no legitimate basis whatsoever to question her credibility or ethics.

55. On May 15, 2018, the Philadelphia District Attorney's Office filed a motion to dismiss the murder conviction in the Patterson case.

56.    The motion, formally known as a Motion to Nolle Prosequi, was written by Cummings and signed off by Chief of Homicide, Anthony Voci, on orders from Larry Krasner. ("The Cummings Motion.") (Attached here as Exhibit 1.)

57.    The Patterson case had been remanded on appeal based on an allegation of ineffective assistance by defense counsel, not any allegation of prosecutorial misconduct.

58.    The Cummings Motion had gone through several drafts before being finalized the day it was filed.

59.    Each of Cummingss earlier drafts included vague suggestions of misconduct by Sax, with no mention of Beth whatsoever.

60.    The idea to falsely accuse Sax of misconduct originated with Cummings and Krasner.

61.    Even so, in the early drafts of the motion the references to Sax were indirect, citing "withheld evidence" without explicitly alleging prosecutorial misconduct.

62.    It wasn't until the day before filing the Cummings Motion that Cummings revised the motion to directly accuse both Beth and Sax of "egregious prosecutorial misconduct," "a violation of the law," i.e. criminal conduct.

63.    Although the Cummings Motion did not name Beth (or Sax) directly, Beth was one of the two prosecutors implicated throughout the document.

64.    The Cummings Motion contained multiple knowingly false statements, including false claims that Beth had engaged in "egregious prosecutorial misconduct."

65.    Specifically, the Cummings Motion alleged in part:

- "Patterson spent 11 years in custody despite the fact that he was 'probably innocent.'"
- "Patterson's conviction is an egregious example of police and prosecutorial misconduct in hiding evidence helpful to the defense that the U.S.

Constitution and the Pennsylvania Constitution require to be revealed to the defense before trial."

- "The constitutional requirements police and prosecutors ignored in Patterson's case are crucial. They protect the innocent and redirect the entire criminal justice system to investigate further to pursue the guilty, all of which protects the public."

- "Prosecution that deliberately violates these constitutional rights is not law enforcement in any sense—it is a violation of the law." (Ex. 1)

59.    Accusing a prosecutor of pursuing charges against an innocent person is among the most serious and damaging allegations that can be made against a member of the legal profession.

60.    It strikes at the core of a prosecutor's ethical duty to seek justice, not convictions, and carries grave implications for both professional reputation and public trust.

61.    Accusing a prosecutor of hiding evidence carries the same gravamen.

62.    Hiding evidence is not only a violation of constitutional due process—it is also a criminal offense under both Pennsylvania law and federal law, including statutes prohibiting obstruction of justice and official misconduct.

63.    In order to advance these false accusations, Cummings deliberately disregarded clear and readily available evidence that directly contradicted her claims of prosecutorial misconduct.

64.    Cummings' failure to acknowledge this exculpatory material was not an oversight—it was a calculated decision undertaken as part of a broader plan to target former prosecutors in order to defame and discredit them.

65.    In the Patterson case, Cummings' specific purpose was to defame Beth McCaffery and Richard Sax, the prosecutors.

66.    According to former Chief of Homicide Anthony Voci, the Cummings' Motion was unnecessary to dismiss the charges.

67.    The sole purpose of the Cummings Motion was to create a public record defaming the prosecutors who handled the case.

68.    No one from the DAO, including Cummings, ever interviewed Sax or Beth before filing the Cumming's Motion.

69.    Both Sax and Beth would have, if asked, denied they concealed any evidence.

70.    Beth would have cited to the dozens of notes and memoranda she prepared during her work on the Patterson case. Such memoranda proved Beth had not withheld evidence but had, in fact, turned over all exculpatory information to the defense prior to trial.

71.    Cummings knew her accusations were false—even without interviewing Beth or Sax—because both the District Attorney's trial file and the public court record conclusively refuted them.

72.    The day after the Cummings Motion was filed, a well-respected, veteran prosecutor sent an internal email about the Cummings Motion, stating he had been "up all night," worrying about "the coming lawsuits" due to "a lot of mistakes and misstatements," noting he was "never consulted" about this filing and only heard about it an hour before it was filed.

73.    The veteran prosecutor's email ended: "We tried to tell you there were major issues with it and it needed to be changed, but it is obviously too late now."

74.    Upon information and belief, a copy of this email was shared with Cummings, yet neither she nor anyone else from her CIU sought to amend the motion or correct the falsehoods contained in the Cummings Motion.

*The Initial Aftermath of Cummings' Lies*

85.    Beth first learned of Cummings' false allegations in May 2018 when she received a voicemail from newspaper reporter, Chris Palmer of The Philadelphia Inquirer, informing her

that an explosive motion had been filed accusing her of intentionally concealing evidence to manipulate the outcome of a murder trial in order to convict and innocent man.

86.     Upon listening to the voicemail, Beth discovered that an article had already been published online at Philly.com titled "Philly DA's Office: Ex-Prosecutors Committed Egregious Misconduct in 2007 Murder Case." The article specifically identified Beth McCaffery as one of the ex-prosecutors. (Ex. 2)

87.     Beth then obtained a copy of the Cummings Motion.

88.     At first, Beth could hardly believe it—it had to be a mistake, she thought. How could Cummings and Krasner brazenly file false allegations to free a convicted murderer—without even bothering to ask me, the original prosecutor, what actually happened?

89.     Before long, the accusations gained local, national, and even international attention. AfterKrasner's Office failed to correct or retract the false accusations, Beth began to realize there was no mistake.  She had become the unwitting victim of Krasner's political agenda and his personal vendettas.

90.     Beth was completely devastated. She experienced physical illness and severe bouts of emotional distress over the damage to her reputation and career prospects.

91.     Beth had built her career on ethical prosecution and unwavering dedication to justice. The idea that her name would forever be associated with "egregious prosecutorial misconduct" was unimaginable.

92.     Beth became despondent. She could not sleep and laid awake at night looping the false accusations in her head, over and over again, agonizing over the impact on her good name.

93.     In the seven years since the accusation was first made, she has endured a torturous cycle of reliving the trauma—the mutilation of her professional reputation—every time these malicious lies resurface.

94.     This ongoing reputational harm has caused severe emotional distress, a sense of professional isolation, and lasting damage to her standing as an attorney.

95.     The false accusations were headlined in the Philadelphia region's largest newspaper and online.

96.     Anyone who searched the internet for the name "Beth McCaffery," including her three sons, would find the accusation of law breaking and "egregious prosecutorial misconduct."

97.     For years thereafter the "egregious prosecutorial misconduct" story was publicized nationally and internationally and hung-over Beth like a black cloud.

98.     Shortly after the Cummings Motion was quoted in the Inquirer, Beth learned her older brother and her parents were secretly nominating her for her high school's sports Hall of Fame.

99.     Beth had been an all-star soccer player at Archbishop Wood High School in Buck's County and a Division One Soccer Player in College at Villanova.

100.     Beth's brother and parents had secretly planned to nominate her for the honor, hoping to surprise her. But, when Beth found out, she called her parents in tears, pleading with them not to go through with it. "The first thing they will do is search my name on the internet and they will see THIS! This lie that I committed egregious misconduct to convict an innocent man!"

*Patterson's Civil Claims*

101.    Within months of the Cummings Motion being filed, Patterson's lawyers notified the City of Philadelphia of his intent to sue for the 11 years he had "wrongfully" spent in jail—years that Cummings and Krasner stated he should never have served.

102.    Soon thereafter, Beth was contacted by the Philadelphia City Solicitor's Office who informed her that the City intended to contest Patterson's claim and sought her assistance in defending against the impending lawsuit.

103.    For the first time since the publication of the Cummings Motion, Beth felt a glimmer of hope that she could clear her name.

104.    Beth began collaborating with the City Solicitor and their investigators to gather the evidence needed to refute the claims made in the Cummings Motion.

105.    The Cummings Motion asserted Patterson could not have committed the murder because he was "friends" with the victim. Determined to challenge this claim, Beth collaborated with the City Solicitor and their investigator to locate the victim's family.

106.    The investigators located the victim's mother and sister, who firmly denied Cummings' claim that their deceased son and brother had been friends with Patterson. Moreover, they revealed to the investigator that no one from Cummings' or Krasner's office had EVER contacted them before the filing of the Cummings Motion and releasing Patterson from prison.

107.    Next, the Cummings Motion claimed that neither of the two eyewitnesses who identified Patterson as the killer had known him before the day of the murder. It also implied that their testimonies had been influenced by pressure or coaching.

108.    Beth informed the City Solicitor that these claims were blatantly false.

109.    First, one of the eyewitnesses was a neighborhood barber who testified at a preliminary hearing and at two trials that he had seen Patterson almost daily for months prior to

the murder. The barber testified he had spoken with Patterson on multiple occasions, making it impossible that he did not know Patterson before the murder.

110.    Next, Beth collaborated with the investigators to track down the two eyewitnesses, neither of whom had ever been interviewed by Cummings or anyone else in Krasner's office. Once located, both eyewitnesses signed sworn statements reaffirming the accuracy of their original testimony identifying Patterson as the murderer.

111.    The Cummings Motion contained numerous other false statements, including the defamatory accusations that Beth had engaged in prosecutorial misconduct by withholding exculpatory evidence.

112.    This exculpatory information involved alternative suspects—individuals linked to a drug gang that, according to some witnesses, had a conflict with the murder victim.

113.    Beth disclosed exculpatory information concerning alternative suspects to the defense, both through formal memoranda and recorded statements from neighborhood witnesses. This material—which could have supported the defense theory that others were responsible for Jackson's murder—was provided well in advance of trial.

114.    The Cummings Motion characterized this alternative suspect information as "strong evidence" that "identified the likely perpetrator."

115.    That claim was baseless. The supposed "evidence" amounted to nothing more than a single note mentioning an unsubstantiated neighborhood rumor—speculative hearsay that lacked any corroboration. When compared to the direct and consistent eyewitness testimony identifying Patterson as the shooter, it was not credible, probative, or worthy of serious consideration

116.    In preparation for defending against Patterson's impending civil lawsuit, the City Solicitor issued a "Notice of Preservation" to the District Attorney's office, including to Cummings

and Krasner individually. Per the Notice, Cummings and the District Attorney's Office had a duty to preserve all Patterson investigative and trial files. (Ex. 3)

117.    The Solicitor obtained and reviewed the transcripts and records of the public proceedings in the prosecution of Dontia Patterson.

118.    These included the October 2007 preliminary hearing, the August 2008 trial prosecuted by Beth, the July 2009 trial prosecuted by Sax, the direct appeal records, and the Post Conviction Relief Act ("PCRA") filings related to the prosecution of Dontia Patterson.

119.    Beth's account of the eyewitnesses' testimony—that they knew Patterson—is fully corroborated by the publicly available transcripts from the preliminary hearing and the two subsequent jury trials.

120.    These transcripts were part of the District Attorney's files that were reviewed by Cummings and made available to NYU.

121.    The City Solicitor also obtained and reviewed a partial copy of defense counsel's file, which included court-authorized subpoenas issued for at least two of the witnesses who had provided the so-called alternative suspect information.

122.    Neither subpoena could have been issued unless Beth had disclosed the identities of these witnesses to the defense prior to trial.

123.    Thereafter, the City Solicitor obtained copies of what Cummings and Krasner asserted was the Patterson file.

124.    Such files obtained by the City Solicitor contained early drafts of the Cummings Motion which lacked any accusations of prosecutorial misconduct and in fact were focused instead on "ineffective assistance of defense counsel."

125.    Beth knew that the complete Patterson file contained no evidence of misconduct by either prosecutor, which is why Cummings' early draft of the Cummings Motion focused instead on assessing the performance of Patterson's defense counsel.

126.    Nor did the Patterson file contain any "strong evidence" pointing to a likely alternative perpetrator. In fact, while drafting the motion and reviewing the file -- ten days before the motion was filed -- Cummings emailed Homicide Chief Anthony Voci asking, "Who do you think was the shooter _____?" (Ex. 4, May 6, 2018 email from Cummings to Voci)

127.    It became clear to Beth and the City Solicitor that the Patterson file produced by the District Attorney was incomplete.

128.    Nonetheless, even the incomplete Patterson file included evidence undermining the accusations of prosecutorial misconduct in the Cummings Motion.

129.    The files produced by the District Attorney's office contained copies of documents that had unquestionably been disclosed to Patterson's lawyer. These documents detailed the exact alternative suspect and drug gang information that the Cummings Motion falsely claimed had been withheld by prosecutors.

130.    When filing the Cummings Motion, Krasner and Cummings had redacted the names of three alternative suspects and gang information from a police intelligence report, the so called "Informant Memo".

131.    The pretextual justification for redacting the "Informant Memo" was to protect the identities of alleged alternative suspects. But this rationale was plainly false.

132.    The unredacted version of the Informant Memo confirms that the prosecution did not conceal the three names of the alternative suspects listed in that report, as those same names

also appeared in witness statements that had already been disclosed to the defense, rendering the redactions misleading and unnecessary.

133.    The true purpose of the redactions when filing the motion was to create confusion about whether the alternative suspect information already disclosed to the defense was consistent with the details contained in the so-called Informant Memo.

134.    Based on her collaboration with the City Solicitor, Beth was confident that this confusion could be resolved if she could access the complete trial file including the memoranda she prepared while prosecuting the Patterson case.

135.    Such memoranda would provide a detailed record of the exculpatory information she had disclosed to the defense, definitively disproving the misconduct allegations made against her in the Cummings Motion.

136.    Beth's hope that the contents of the case file would swiftly disprove the attack on her reputation was soon shattered when she was informed by the City Solicitor that the copy of the Patterson file provided to the Solicitor's Office contained none of the notes or memoranda she had authored disclosing the Informant Memo and other exculpatory information.

137.    This was shocking, given Beth's well-documented and long-standing practice of typing and signing her own memoranda to formally record the disclosure of exculpatory information to the defense.

138.    In addition, her personal notes meticulously tracked her trial preparation, including communications with defense counsel about trial matters—particularly the handling of exculpatory evidence.

139.    Beth also routinely faxed these memoranda without a cover sheet, ensuring that the exact image of the memo appeared on the fax confirmation page, creating indisputable proof of transmission.

140.    Beth estimated that, in the Patterson case, she would have drafted, signed, and faxed more than a dozen memoranda documenting the transmission of exculpatory information to defense counsel. Additionally, Beth would have compiled over 40 pages of handwritten notes detailing her trial preparation, which were also suspiciously missing.

141.    Cummings was the last person with access to the Patterson file before it was shared with the City Solicitor.

142.    The Patterson file intact and undisturbed would have rebutted all of the false accusations in the Cummings motion.

143.    Despite the shock of discovering that the file was now missing key evidence that would have directly rebutted Cummings' malicious accusations, Beth remained hopeful that the civil litigation would offer a path to expose the truth and restore her reputation.

144.    Then in 2020 —after nearly two years of working closely with the City Solicitor to defend against Patterson's claims—Beth learned that the City of Philadelphia had agreed to settle the lawsuit, paying Patterson $1.6 million, despite objections from both the investigators and the attorneys assigned to the case.

145.    Following the settlement of Patterson's claims, Beth began exploring other avenues to prove her innocence. In December 2020, through counsel, she submitted a Right-to-Know request to the Philadelphia District Attorney's Office. The request sought:

> "…a full copy of the District Attorney's trial file, all intra-office emails regarding any stage of the above-captioned case, including emails with third parties, and any and all memoranda, notes, emails, facsimiles, or facsimile confirmations related to the above-captioned case and containing any of the following terms: 'McCaffery,' 'ADA McCaffery,'

'Beth McCaffery,' or 'ADA Beth McCaffery.' Also requested were all files related to the appeal of the above-captioned case."

146.    It would take another four years and three months of obstruction and resistance from the District Attorney's Office before the Right-to-Know litigation was finally resolved—and the full extent of Cummings' misconduct began to come to light.

*NYU and NYU Law Hire Cummings as "Research Scholar," Despite Obvious Reasons to Doubt Her Credibility*

147.    Shortly before Beth filed her Right-to-Know request—and around the same time the City settled with Dontia Patterson in the summer of 2020—Cummings began a fellowship at New York University's Zimroth Center for the Administration of Criminal Law, serving as a "Research Scholar," separate and apart from her official role as Chief of the Conviction Integrity Unit at the Philadelphia District Attorney's Office.

148.    Upon information and belief, as of the date this Complaint is filed, Cummings remains on the Zimroth website under the "Team" banner, with a bio stating she is "currently a Research Scholar with the Zimroth Center."

149.    In her capacity at NYU, Cummings was authorized to act on behalf of the University to review and obtain confidential and sensitive trial and criminal investigative documentation from the files in the Philadelphia District Attorney's Office as part of a research project and report on alleged "prosecutorial misconduct".

150.    In this regard, NYU, NYU Law, Cummings and others conspired to review, copy and possess law enforcement investigative files for inclusion in the Zimroth Report, titled Prosecutorial Misconduct in the Philadelphia District Attorney's Office ("The Zimroth Report")[1].

---

[1] The Zimroth Report is publicly available for viewing and hereby incorporated in its entirety by reference at the following URL:
https://www.law.nyu.edu/sites/default/files/Prosecutorial%20Misconduct%20in%20the%20Philadelphia%20District%20Attorney%E2%80%99s%20Office_508_0.pdf

151.    For over four years, the District Attorney's Office actively cooperated in efforts to share trial files with NYU, even as it simultaneously denied Beth access to documents she had personally created while prosecuting the Patterson case.

152.    Accessing such criminal trial files is a crime under Pennsylvania's Criminal History Record Information Act ("CHRIA"), 18 Pa. C.S.A. §9106(c)(4)(". . .investigative and treatment information shall not be disseminated to any department, agency or individual unless the department, agency or individual requesting the information is a criminal justice agency.") 18 Pa.C.S.A. § 9106(g)("Any person, including any agency or organization, who violates the provisions of this section shall be subject to . . . criminal penalty provided by law.")

153.    Nevertheless, Cummings shared and caused to be shared the confidential investigative and trial files with NYU and non-members of any law enforcement agency while simultaneously holding an academic fellowship at NYU.

154.    During this time, Cummings operated in dual roles—serving as a prosecutor in the Philadelphia District Attorney's Office's so-called Conviction Integrity Unit while also working as a Fellow at NYU.

155.    When NYU and NYU Law engaged Cummings in 2020 for the specific purpose of exploiting her access to criminal investigative materials she—and they—were engaging in criminal conduct in violation of CHRIA.

156.    Indeed, there were ample public records then available to easily demonstrate Cummings' lack of integrity and serial violations of her ethical obligations.

157.    In addition to the legally problematic nature of Cummings' dual employment arrangement, there were other clear and compelling reasons why selecting her as the "researcher" for this project was beyond reckless. NYU and NYU Law knew that Cummings had a well-

documented and public history of submitting false and unreliable statements to courts, as well as engaging in conduct contrary to both the law and established ethical rules.

158.    For example, in December 2017, a year and a half before Cummings was hired as a Research Fellow, Judge Donna King, a District Judge in Williamson County, Texas, found that Cummings had provided multiple "unreliable" statements in a sworn affidavit regarding her representation in a high-profile criminal case.

159.    The Texas Court determined Cummings' claims about thoroughly advising her client and investigating alternative defense strategies were contradicted by multiple witnesses, including co-counsel and the defendant.

160.    Judge King specifically noted Cummings' assertions about appellate options and trial strategy were inconsistent with the testimony of others involved in the case, leading the Court to reject her account as not credible.

161.    Additionally, Judge King found Cummings ignored multiple "red flags" indicating she had a serious, undisclosed conflict of interest.

162.    In this regard, despite having previously represented members of a key family involved in the case, including in a juvenile sex crime matter, Cummings failed to disclose the full extent of her prior legal work to her co-counsel, the defendant, or his family.

163.    The Court determined that such lack of disclosure compromised Cummings' ability to effectively represent her client and influenced her decision not to pursue an alternative suspect defense, even when presented with clear evidence that misidentification was viable.

164.    Ultimately, the Texas Court concluded Cummings' prior relationship with individuals connected to the case "colored" her legal strategy, preventing a full and impartial defense.

165. Cummings' failure to acknowledge or act on the evident conflict of interest was a central factor in the Texas Court's finding that her representation was deficient and had denied her client effective assistance of counsel.

166. The ethical and credibility concerns surrounding Cummings were not confined to her prior work in Texas. During her tenure as head of the Conviction Integrity Unit in Philadelphia, she developed a similarly well-earned reputation for dishonesty, unreliability, and a disregard for basic standards.

167. In February 2021—two years and ten months before NYU published its report—Federal Judge Mitchell Goldberg issued an opinion explicitly questioning Cummings' practice of making broad allegations of prosecutorial misconduct without first obtaining testimony from the former prosecutors involved (conduct strikingly similar to the behavior that led to the false accusation of prosecutorial misconduct in the in the Patterson case).

168. Goldberg, himself a former prosecutor in the Philadelphia DA's Office in the 1980s, said he found it "disconcerting" that Cummings was alleging a "veteran former" ADA "had knowingly and intentionally withheld substantial evidence pointing to another suspect," and "prosecuted a potentially innocent person, obtained a first-degree murder conviction, and stood silent as a life sentence was imposed."

169. Judge Goldberg issued a sharply worded opinion criticizing Patricia Cummings for "ma[king] no effort to obtain any type of explanation" from the original prosecutors before leveling serious allegations of misconduct. Judge Goldberg emphasized that he had "pressing questions" that "were about to be explored" with the trial ADA at an evidentiary hearing scheduled for November 10, 2020, and he described the prosecutor's testimony as "indispensable."

170.    In March of 2021, two years and eleven months before NYU published the Zimroth Report, and only three months after Cummings commenced her work for NYU, Philadelphia Common Pleas Judge Rosemary Defino-Nastasi, a former Public Defender, condemned Cummings' conduct in another case, again raising concerns about her lack of candor and failure to act in good faith.

171.    Judge Defino-Nastasi questioned whether Cummings – as the Commonwealth's attorney – had violated her duty of candor to the Court and duty to act in good faith on behalf of the public.

172.    Judge Defino-Nastasi also pointed out that Cummings made several unsubstantiated claims, including conclusions without interviewing a key witness—a failure she deemed "entirely inappropriate." (Once again, the same conduct that led to the false accusation of prosecutorial misconduct in the Patterson case.)

173.     Judge Defino-Nastasi elaborated on Cummings apparent breach of her ethical obligations:

> "As to Counsel's duty of candor toward a tribunal, frankly, it is indiscernible to this Court whether Counsel was willfully deceitful or just inadvertently so, because the Commonwealth's pleadings have created a confusing web of contradictions for this Court to have to sift through."

174.    Judge Defino-Nastasi further emphasized that Cummings should have supported her claims with evidence, stating: "A prosecutor has an absolute duty to support their claims with evidence, plain and simple. A hunch or assumption will not stand up in a court of law."

175.    Judge Defino-Nastasi concluded by expressing doubt about whether Cummings had conducted a full and forthright investigation, stating: "This Court is left wondering whether the Commonwealth has acted in good faith and been forthright in its investigation into this case and whether or not they have truly turned over every stone for our citizens."

176.    In October of 2022, in another case involving Cummings, Krasner's office was again chastised by a trial court judge for a lack of candor and abusing the court process in the case of Ryan Pownell.

177.    Judge Barbara McDermott (a former criminal defense lawyer) said:

> "This Court believes that the Commonwealth (Krasner's office) misrepresented to Judge -- the supervising judge -- -- about whether or not after the presentment was approved, whether or not he was entitled to a preliminary hearing."

178.    In addition to Cummings' uniquely compromised credibility, there were numerous readily available public sources that, at a minimum, cast serious doubt on the reliability of the claims advanced by Krasner's Office in court filings.

179.    In another case before Judge Goldberg, the Judge ordered a hearing before accepting the DA's concession in a death penalty case because he "preliminarily conclude[d] that on two critical issues in the case, … the District Attorney was less than candid."

180.    In 1984, Robert Wharton and an accomplice forced their way into the Harts' home at knifepoint. They bound, robbed, strangled, and drowned Bradley and Ferne Hart, then turned off the heat, leaving the couple's seven-month-old daughter, Lisa, to freeze. Against all odds, she survived. A jury convicted Wharton of these crimes and sentenced him to death.

181.    Wharton later filed a federal appeal, and the Philadelphia District Attorney's Office, under Larry Krasner, chose to concede rather than challenge it.

182.    In September of 2022 – 18 months before NYU published the Zimroff Report – Judge Goldberg issued a published opinion concluding that:

> "The Office (Krasner's office) had made representations to th[e] Court that lacked evidentiary support and were not in any way formed after 'an inquiry reasonable under the circumstances.'"

183.    Judge Goldberg called the misrepresentations "egregious" and "exceptional."

184.    The Judge also ordered Krasner to personally apologize to Lisa for excluding her from the appeal process.

185.    In March of 2024 – weeks before NYU published the Zimroff Report – the 3rd Circuit Court of Appeals upheld the sanctions, emphasizing:

> "Courts rely on lawyers' honesty; lawyers may not mislead them. But the Philadelphia District Attorney's Office did just that. It conceded that a court should vacate Robert Wharton's death sentence. Yet in doing so, it did not comply with this Court's instruction to investigate evidence cutting against Wharton's habeas claim."

186.    This ruling was publicized in the Philadelphia Inquirer under the headline:

> Philly DA Larry Krasner's office misled court while trying to free a man from death row, federal appeals court rules

187.    The subheading noted that:

> "The ruling is the latest instance in which courts have questioned one of the primary accomplishments Krasner has touted during his tenure: his office's efforts to exonerate dozens of defendants."

188.    NYU had every opportunity—and indeed the responsibility—to examine the publicly available information that directly challenged the reliability of the court filings and other claims advanced by Krasner's Office.

189.    NYU also had both the opportunity and the responsibility to conduct an independent analysis of the practices of the Philadelphia District Attorney's Office under Larry Krasner, particularly as they related to the CIU's review and dismissal of convictions secured by prior prosecutors.

190.    Had NYU fulfilled that responsibility; it would have readily discovered that the methodology employed by the CIU—like the approach taken in the Patterson case and the cases cited for criticism by multiple courts described herein—was deeply flawed and systematically

biased. That process was marked by shortcuts, misrepresentation of facts, and a willful refusal to interview witnesses or examine evidence that might contradict predetermined conclusions favoring convicted offenders.

191.    Under Cummings' direction the CIU failed to follow basic investigative protocols, ignored key evidence, misled Judges, and ultimately secured dismissals in high-profile cases without a legally or factually sound basis.

192.    The fact that such grave misconduct could have been uncovered by NYU through an honest examination of just a single case underscores the magnitude of the Defendants' failure to conduct any independent investigation.

193.    Instead, in the case of Dontia Patterson, NYU chose to rely on the direction and unverified assertions of three deeply compromised sources—Patricia Cummings, Larry Krasner, and Krasner's Conviction Integrity Unit—whose stated and clear purpose and intent was to defame and ruin former prosecutors.

194.    Despite these many red flags and numerous substantive reasons to question the credibility of Patricia Cummings and any work product originating from the Philadelphia District Attorney's Conviction Integrity Unit, NYU and NYU Law purposely ignored readily available sources of information that directly contradicted the accuracy of the accusations lodged against Beth.

*Beth Pursues the Right-to-Know Request*

195.    When Beth submitted her Right-to-Know request in December 2020, the District Attorney's Office was legally obligated to review the requested files and determine whether they were subject to disclosure.

196.    During that review, junior attorneys assigned to the matter discovered that a substantial portion of the trial file—including the very notes and memoranda authored by Beth—was missing.

197.    Cummings was working at the District Attorney's office and for NYU when the Right to Know request was received.

198.    When the junior attorneys assigned to the Right to Know matter went to review the file they discovered that a substantial portion of the trial file—including the very notes and memoranda authored by Beth—was missing.

199.    In an effort to locate the missing files, the attorney questioned all personnel within the District Attorney's Office who had access to the file, including Patricia Cummings. The missing files were never located.

200.    Rather than disclosing this critical fact to Beth or her counsel, the District Attorney's Office instead issued a formal denial stating cryptically that "all available files" had been reviewed and that none of its contents were subject to disclosure under the Right-to-Know Law.

201.    Ironically, the denial relied in part on the Criminal History Record Information Act (CHRIA), invoking its restrictions on the circulation of law enforcement investigative materials—despite the fact that the very records sought had, by that point, already been selectively shared with NYU.

202.    Beth vigorously contested the District Attorney's denial of her Right-to-Know request for four years and three months through Philadelphia's administrative and judicial systems, including an appeal. In doing so, she incurred substantial legal fees and other costs in her ongoing

effort to obtain records she had personally created and which were critical to defending her reputation.

203.    The resistance by Krasner and Cummings persisted until the spring of 2025, when Judge Ann Marie Coyle of the Philadelphia Court of Common Pleas ordered an evidentiary hearing on Beth's Right-to-Know request.

204.    On February 21, 2025, Judge Coyle convened an evidentiary hearing in the Right to Know matter, to determine: (a) whether Krasner and Cummings' office had acted in bad faith by concealing Beth's memoranda in the Patterson case; and (b) whether the Philadelphia DAO waived any objection to granting Beth access to the trial file by previously sharing such file with NYU and the Zimroth Center.

205.    The second witness at the evidentiary hearing was Anthony Voci, the former head of Homicide in the Philadelphia DAO, who signed a verification under oath attesting to the "facts" in the Cummings Motion.

206.    Shockingly, Voci testified under oath that he had signed the Cummings Motion WITHOUT reading it.

207.    Voci admitted to doing "virtually nothing" to verify the accuracy or truthfulness of the assertions of the Cummings Motion and further stated that he did NOT believe Beth had engaged in prosecutorial misconduct.

208.    Voci further admitted that the Cumming's Motion was unnecessary to accomplish its intended purpose—the same relief could have been requested without any written motion.

209.    In other words, the Cumming's Motion was superfluous and filed for no legal purpose—its only purpose was to defame and ruin Beth McCaffery and Richard Sax.

210.    Voci further testified at the Coyle trial that the Cummings Motion was written by Cummings, that she worked closely with Krasner and that therefore he was ORDERED TO SIGN THE MOTION.

211.    Later, in the same trial, Larry Krasner denied ordering Voci to sign but testified that, as the District Attorney, he was the only person who could have given such an order to Voci.

212.    Cummings was scheduled to testify at the evidentiary hearing before Judge Coyle regarding the missing memoranda notes and disclosure documentation in the Patterson file.

213.    But shortly before the February hearing, Cummings informed the Philadelphia District Attorney's Office she was unwilling to testify, explaining she was in communication with NYU regarding her potential testimony, and that her attorney advised her against testifying.

214.    At the conclusion of the Right to Know Hearing, Judge Coyle made several significant factual findings exonerating Beth and condemning the members of the DAO (including Cummings) involved in falsely accusing her of prosecutorial misconduct.  In this regard, Judge Coyle:

- exonerated Beth of the accusations of prosecutorial misconduct, which Judge Coyle found had no factual basis, were maliciously intended, and stemmed from political motives.
- acknowledged Beth's integrity and courage, affirming that her testimony was credible and supported by independent corroboration.
- determined that crucial case documents were deliberately removed and/or destroyed by the DAO.
- determined the Cummings Motion contained numerous false and misleading statements.
- noted a lack of transparency and candor during legal proceedings, particularly in representations made to Judges who presided over post-conviction proceedings in the Patterson case.
- determined the DAO failed in its duty to present accurate and complete information, leading to a disturbing pattern of misrepresentations.
- determined that the requested records under the Pennsylvania Right-to-Know Law should be disclosed, as the DAO did not justify their exemption, and the DAO had already provided similar records to public entities, including to NYU's Peter Zimroth Center.

- determined that the DAO engaged in bad faith conduct and abuse of authority, which also warranted the release of records in redacted form.
- imposed severe sanctions on the DAO, including financial penalties and mandatory training on ethical and professional responsibilities. The DAO was ordered to pay fines to Beth and Sax and a separate fine to the Court of Common Pleas.
- ordered an audit of DAO files related to cases mentioned in the NYU Zimroth Report, to determine if similar misconduct occurred in those matters.
- directed the DAO to implement standard operating procedures to improve file management and prevent future misconduct.

215.    Ultimately, Judge Coyle emphasized that the actions of the District Attorney's Office reflected systemic ethical lapses and abuses of power requiring immediate correction.

216.    The next day, the Philadelphia Inquirer, the same publication that had previously named Beth in an article headlined "Ex-Prosecutors Committed Egregious Misconduct in 2007 Murder Case," published a new article that included Judge Coyle's finding that the accusations against Beth "had no good faith basis" and were "maliciously intended."

217.    Despite the public exposure of the falsity of the Cummings Motion, NYU still refuses to remove or amend the Zimroth Report from publication.

218.    Upon information and belief, it is highly likely that Defendant Cummings personally removed and/or destroyed critical case documents, including Beth's memoranda and handwritten notes – records that would have disproven the false allegations later repeated in the Zimroth Report.

219.    Indeed, even Judge Coyle, when addressing her final findings of facts, unequivocally stated:

> "I don't believe for one millisecond that the documents at issue weren't intentionally misplaced. I believe they were intentionally misplaced. I believe at this point in time there are certain documents that are -- that have been destroyed, omitted, moved, misplaced, what have you."

220.    Even if she had not been directly responsible for such destruction, Cummings had ample notice and access to information establishing that her published allegations were false.

221.    As early as 2018, immediately following the filing of the Cummings Motion, experienced members of the Homicide Unit raised urgent concerns, describing the motion as riddled with "serious mistakes and misstatements."

222.    Cummings was further aware that neither she nor anyone in the District Attorney's Office had contacted the victim's family to verify core claims of the motion.

223.    She also knew that the assertions of prosecutorial misconduct had never been tested or affirmed in any judicial proceeding and were directly rebutted by public statements from Richard Sax, the trial prosecutor who obtained the conviction.

224.    Moreover, before the time the Zimroff Report was published, Cummings was fully aware that files were missing and that a formal Right-to-Know Law request had been filed on Beth's behalf seeking the very documents Cummings had either concealed or failed to preserve.

225.    Cummings' decision to nonetheless endorse and repeat the defamatory claims about Beth reflects actual malice and a reckless disregard for and/or purposeful avoidance of the truth.

*The Zimroth Report Is Published*

226.    In April 2024, while Beth's Right-to-Know appeal was still pending in the Philadelphia court system, NYU Law, through the Zimroth Center, published the 180-page report titled Prosecutorial Misconduct in the Philadelphia District Attorney's Office. The report accused over 40 former prosecutors—including Beth—of prosecutorial misconduct. (The "Zimroth Report.")

227.    As indicated by its title, the Zimroth Report focused specifically on individual prosecutors within a single office—the Philadelphia District Attorney's Office.

228.    The first 34 pages of the Report present broad, global descriptions of that office, including its institutional history and organizational culture.

229.    These wide-ranging topics include chapters such as "The Culture of the Philadelphia District Attorney's Office" and "Common Themes: Prosecutorial Misconduct and the Philadelphia DAO."

230.    The Report asserts that the "Culture of the Philadelphia District Attorney's Office" was "in large part shaped by the political history of the city."

231.    It attributes this culture to the influence of former Police Commissioner and Mayor Frank Rizzo, whom it describes as having acted with "little accountability" and "brute force."

232.    The Report notes that, "When he was later elected mayor, Rizzo continued his tough on crime policies, which stoked racial division."

233.    It quotes a 1979 New York Times article observing that Rizzo had polarized the city "along racial lines" and was a "one-issue Mayor" focused solely on "law and order."

234.    According to the Report, the District Attorney's Office operated "within this ecosystem."

235.    The Zimroth Report characterized the Philadelphia District Attorney's Office before Larry Krasner's tenure as a place where "prosecutors viewed trial as 'a game to win,' and "they adopted a distorted view of their constitutional and ethical obligations because of their collective focus on pursuing and defending convictions at all costs"

236.    The Zimroth Report expressly acknowledged and thanked "Research Scholar Patricia Cummings" for her "assistance with research and drafting the report.

237.    Under the heading Case Research: Scope and Methodology, the Zimroth Report states it would "whenever possible identify the trial and post-conviction prosecutors who worked on these cases. …..their names have been bolded throughout the Report."

238.    According to the Zimroth Report, the reasoning behind this approach was straightforward: "First, prosecutors are rarely identified in judicial opinions or legal filings, which makes it difficult for the public to assess whether the Office is upholding its ethical and constitutional obligations. Second, the failure to identify prosecutors involved in misconduct contributes to the public perception that prosecutors are not held accountable for their actions, and this in turn erodes community trust in the Office's work. Third, identifying the prosecutors who are failing to uphold their constitutional and ethical obligations will help the Office determine what policy solutions are necessary to improve its work, including whether to audit or scrutinize cases handled by these prosecutors."

239.    The Report's authors—including Cummings—had a clear purpose in naming prosecutors:

> Shaming, even if it is only a list of prosecutors' names and a description of their actions, could be very effective. In a profession where reputation is the most valuable commodity, identifying perpetrators of prosecutorial misconduct will be embarrassing. Moreover, it will also carry residual punishment … by diminishing a lawyer's chance of later achieving a judgeship or other high status public service job. Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct, 42 U.C. Davis L. Rev. 1059, 1101 (2009), attached hereto as Exhibit "__."

240.    Another passage emphasizes the damage such shaming causes: "The shamed prosecutor may quit her job … [and] will have a tough time surviving the vetting process to be hired in another county prosecutor's office." *Id.*

241.    Thus, the ***admitted intent and purpose*** behind the Zimroth Report was to inflict reputational damage and defame Beth as a former prosecutor and to diminish her professional prospects.

242.    The section of the Report that names Beth McCaffery appears in the Report's Case Appendix.

243.    Per the cover page of Appendix the information:

"..is taken from court findings and/or CIU conclusions regarding Brady, Giglio, and/or Napue violations. When courts and/or the CIU determined that these legal violations occurred, we have added additional facts for the reader to understand and assess the violation and the prosecutor's conduct."

244.    CIU here refers the Conviction Integrity Unit, the unit supervised by Cummings.

245.    Beth and Sax were accused of Brady violations.

246.    The "CIU conclusions" regarding Brady violations in the Patterson case were Cumming's conclusions.

247.    Cumming's conclusions about prosecutorial misconduct were included in he false and maliciously intended Motion which is quoted in the Zimroth Report.

248.    Beth is named in bold print twice, beginning on page 73 of the Zimroth Report, in the section entitled Dontia Patterson (2018).

249.    The Patterson section of the Appendix includes several subheadings—"The Criminal Investigation and First Trial," "The Retrial," "The CIU-Homicide Unit Investigation," and "Patterson is Exonerated" make clear that the Report purports to summarize the full course of the prosecution.

250.    The Report combines multiple public proceedings and filings from the Patterson prosecution in order to identify and implicate Beth and Sax by name.

251.    These proceedings and filings include, in chronological order: the preliminary hearing; the August 2008 jury trial prosecuted by Beth; the July 2009 jury trial prosecuted by Sax; Patterson's direct appeal; his Post Conviction Relief Act (PCRA) filings; and the hearing and transcript associated with the Motion to Nolle Prosequi.

252.    The Report also combines allegations from these other proceedings to present factual assertions that are included to "help the reader understand and assess the violation and the prosecutor's conduct".

253.    As part of its multi-part narrative purporting to summarize the full course of the prosecution, the Zimroth Report extensively quotes the false claims made in the Cummings Motion in its final section, titled "Patterson is Exonerated." That section states:

> "Based on the CIU's findings, ADA Anthony Voci, then-Chief of Homicide, filed a motion to dismiss the charges against Patterson. In the motion, ADA Voci noted that two different prosecutors failed to find and disclose this favorable information, even though homicide prosecutors were 'trained to review the police homicide file and ask questions' about the investigation. The motion also described Patterson's two trials as 'egregious example[s] of police and prosecutorial misconduct,' and it further noted that some of the information should have caught prosecutors' attention because it was obviously favorable to the defense. For instance, the Informant Memo and related witness interviews did not mention Patterson as a suspect, and police created two different photo arrays that did not contain Patterson's photograph, which ostensibly should have raised questions for the prosecution.

Separately, the motion criticized the prosecution's case as 'illogical,' given that Patterson returned to the crime scene, where witnesses saw him distraught and crying on the street immediately after the murder. It also raised the possibility that, without suppressing the favorable information, 'the prosecution could not win' the case against Patterson, and it noted that favorable information tends to be suppressed in 'weak cases.'

254. Finally, it criticized the prosecution for being unduly influenced by the 'pressure to win' 'serious cases,' and observed that '[s]ome [prosecutors] feel the end justifies the means.'"

255. A footnote in the Dontia Patterson section links to the full text of the Cummings Motion, thereby republishing in full all of its false and defamatory accusations against Beth.

256. In describing the facts of the case to support its claims of misconduct against Beth, the Report does two things: first, it disregards the factual record reflected in the trial transcripts and other public filings; and accepts as true the inaccurate allegations advanced in the Cummings Motion.

257. By favoring and republishing the false factual assertions in the Cummings Motion over the public record of sworn testimony—and by privileging the defense's arguments and claims over the neutral, comprehensive record—the Zimroth Report deliberately expands a single, adversarial filing, authored by Cummings with malicious intent, as a fair representation of the entire prosecution – despite it being contradicted by all other records available and reviewed by Defendants.

258. Second, the Zimroth Report also intentionally mischaracterizes other key aspects of the public record that do not appear in the Cumming's Motion in an effort to further bolster her false narrative.

259.    The result of this deliberately misleading approach is to publish a distorted account of the prosecution of Dontia Patterson—a fictionalized narrative crafted to defame and malign both Beth and Sax.

260.    Patterson was prosecuted based in part of the testimony of two eyewitnesses to the murder.

261.    Both the Cummings Motion and the Zimroth Report mischaracterize the strength of the eyewitness testimony. The Cummings Motion falsely claims that neither witness knew Patterson. The Zimroth Report takes a different approach, asserting instead that the witnesses "only briefly saw the shooter".

262.    The clear purpose of this characterization is to suggest that the eyewitness identification was unreliable and thus insufficient to justify prosecuting Patterson—and, furthermore, that a prosecutor relying on such weak evidence would be motivated to manipulate the record in order to obtain a conviction.

263.    The characterization of the eyewitness evidence in the Zimroth report was knowingly false.

264.    The public record, however, tells a decidedly different story.

265.    The eyewitnesses were Allan Brunache ("Brunache") and Pierre Laventure ("Laventure").

266.    The public record shows that Brunache testified at the 2008 and 2009 trials that he had seen Patterson more than ten times prior to the shooting (*See* 2008 Trial Tr. vol. 1, 13, Aug. 11, 2008 attached hereto as Ex. 5). Patterson had been in Brunache's shop and he had spoken with him, and recognized him clearly. He observed Patterson's face during the shooting and testified unequivocally: "I saw him. It was him. I saw you. It was him shooting" (*See* 2008 Trial Tr. vol. 1,

8, Aug. 11, 2008). He further described Patterson's facial features, including bumps, and confirmed there was nothing obstructing his view (*See* 2008 Trial Tr. vol. 1, 40, Aug. 11, 2008; *see also* 2009 Trial Tr. vol. 1, 82–83, July 7, 2009; *see also* attached hereto as Exhibit "6").

267.    Laventure also testified at two trials that he directly witnessed the shooting, identified Patterson in court (*See* 2008 Trial Tr. vol. 1, 30–36, Aug. 6, 2008; *see also* 2009 Trial Tr. vol. 1, 19–24, July 6, 2009), and gave a detailed description of Patterson's height, complexion, and facial features (2008 Trial Tr. vol. 1, 44–48, Aug. 6, 2008; 2009 Trial Tr. vol. 1, 30–33, July 6, 2009), as well as a prompt and confident photo array identification (2008 Trial Tr. vol. 1, 49, Aug. 6, 2008). He too described Patterson's return to the scene in different clothing and acting innocent (2009 Trial Tr. vol. 1, 27–32, July 6, 2009).

268.    The eyewitnesses' identifications were clear, detailed, and consistent. Laventure's description during his 911 call was so specific that an officer at the scene was able to identify Patterson among a crowd of twenty to thirty bystanders.

269.    The Zimroth Report also described Patterson as "distraught" upon returning to the crime scene and editorialize that "[d]espite his behavior at the scene and his lack of motive, police arrested and charged Patterson with Jackson's murder".

270.    In reality, eyewitnesses Allan Brunache and Pierre Laventure both testified that Patterson returned in different clothes and was acting "innocent" (2008 Trial Tr. vol. 1, 47, Aug. 6, 2008)—leaning over the victim, shouting "Who did it?" and picking up a marijuana cigarette. (2008 Trial Tr. vol. 1, 26, Aug. 11, 2008).

271.    Brunache testified that Patterson was "hype" and "loud," (2008 Trial Tr. vol. 1, 24, 28, Aug. 11, 2008), stating that he was pretending and trying to act like he didn't do anything. He

described Patterson as intimidating and reported, in real time, during a 911 call that the shooter changed his clothes.

272.    These contemporaneous, detailed observations—critical to understanding the actual basis for the arrest—were omitted entirely from the Zimroth Report, despite their obvious relevance. The Report's portrayal of Patterson's behavior at the scene is not merely incomplete; it is affirmatively false.

273.    The Report and the Motion also allege that Officer Chandler altered her account regarding the surveillance video.

274.    In reality, however, Officer Chandler's publicly available trial testimony was consistent: she stated that the individual in the video reminded her of Patterson based on his physical mannerisms and gait—not facial recognition (2009 Trial Tr. vol. 1, 53–54, July 7, 2009). There was no contradiction—that allegation was manufactured by Cummings.

275.    Although the Zimroth Report cites the Cummings Motion on several key points, it goes beyond the Motion to fabricate certain other facts to help "the reader to understand and assess the violation and the prosecutor's conduct."

276.    For example, the Zimroth Report goes beyond the Cummings Motion to falsely portray the proceedings in is its treatment of the so-called "Informant Memo".

277.    The Report first describes the memorandum and its contents:

"Police documented this information in a memorandum (the "Informant Memo"), which also contained detailed information about the two groups involved in the drug dispute, as well as *the names of three people who were potentially involved* in the murder—including the possible shooter."

278.    Next the Report falsely asserts that;

41

"……. the Informant Memo and related witness interviews did not mention Patterson as a suspect…."

279.    This claim is demonstrably false. The underlying unredacted Informant Memo, which Cummings and the DAO reviewed, does mention Patterson—albeit by his street name, "Donte."

280.    The Informant Memo contains only three names, one of whom is Donte.

281.    As reflected in the memo, the individual known as Donte was described as being present ***during the shooting*** and detained by police at the scene. Other than noting his presence "during the shooting" there is no indication as to whether Patterson is or is not a suspect.

282.    Not even the Cummings Memo—despite its many falsehoods—claims that Patterson is not one of the three names mentioned in the Informant Memo. That falsehood originates solely with the Zimroth Report.

283.    The District Attorney trial file included statements made by two neighborhood witnesses later listed as trial witnesses—that indicate that "Donte" referred to Dontia Patterson.

284.    These same witnesses also identified the two other alternative suspects in the Informant Memo.

285.    It is clear from the public records - including three separate, publicly available court transcripts, the direct appeal filings, and the Post Conviction Relief Act ("PCRA") filings, which were all reviewed by the Defendants - that these names were turned over to the defense.

286.    Both witnesses were listed as potential witnesses during jury selection at Patterson's trials and court approved subpoenas were issued for both of them for trial.

287.    Cummings and or the other authors of the Report, knowing the memo was sealed, misrepresented its contents of the Informant Memo by claiming Patterson was not mentioned.

288.    They also ignored the trial transcripts and other public filings that demonstrated that the "rival drug gang" alternative suspect information had been turned over to the defense.

289.    This false narrative served not only to obscure Patterson's initial identification as a suspect but to fabricate a *Brady* violation where none existed.

290.    This material misrepresentation further demonstrates the Defendants' intentional distortion of the available public records to support the false narrative that Beth McCaffery withheld exculpatory evidence as a means to prosecute an innocent man – which is a despicable accusation.

291.    The Zimroth Report further falsely states that "[b]oth witnesses also saw Patterson at the scene, and on cross-examination they admitted that Patterson was wearing different clothing than the shooter."

292.    This statement does not appear in the Cummings Motion.

293.    Instead, it is a deliberate mischaracterization of the trial proceedings by the authors of the Zimroth Report.

294.    This mischaracterization is intended to convey the false claim that the eyewitnesses recanted their identification testimony.

295.    A fair review of the trial transcripts demonstrates that neither witness recanted their identification on cross-examination. Both consistently testified that Patterson returned to the scene wearing different clothes (2008 Trial Tr. vol. 1, 47–48, Aug. 11, 2008; 2009 Trial Tr. vol. 1, 29–30, July 6, 2009). Rather than undermining their identifications, this detail reinforced them—both witnesses testified that Patterson changed clothes to evade detection, not because he was misidentified.

296.    The Zimroth Report also inaccurately summarized Patterson's alibi evidence, stating: "Patterson's sister testified that they were home together, and she saw him sleeping in bed before she went to the bathroom. When she was showering, she heard three bangs and saw her brother getting dressed and running out of the house. Based on the house layout, she said there was no way for him to have snuck out without being seen."

297.    Again, this statement does not appear in the Cummings Motion. It is a knowingly gross distortion of the trial record, intended to advance Defendants' agenda of defaming Beth.

298.    Kareema Patterson—Dontia's sister—admitted on cross-examination that she was not sure whether Dontia was actually asleep (2008 Trial Tr. vol. 1, 111–113, Aug. 11, 2008; 2009 Trial Tr. vol. 1, 18–28, July 9, 2009). Her testimony was riddled with contradictions: she alternately claimed she saw him in a towel and getting dressed, and she did not come forward with the alibi until more than a year later.

299.    Her credibility was further undermined by prison phone calls in which she and her mother were coached by the defendant on what to say (2009 Trial Tr. vol. 1, 42–58, July 9, 2009).

300.    At the second trial, the defense declined to call her. Instead, she was called by the prosecution to show that she had colluded with Patterson to offer false testimony. The trial court specifically instructed the jury that she was not a Commonwealth witness and that her testimony did not bind the prosecution.

301.    The Zimroth Report also falsely mischaracterized Beth's arguments to the jury in the first trial, stating: "She (McCaffery) argued that Patterson shot Jackson and fled back to his house, where he changed clothes and then returned to the scene."

302.    The claim that Beth advanced a specific theory about Patterson returning home to change is a fabrication, not found in any trial transcript. It is yet another invented "additional fact"

designed to portray the prosecution and her arguments as unsupported by evidence and illogical thereby supporting the Report's narrative of prosecutorial misconduct.

303.    The Report makes other materially false claims about the Beth's arguments at trial; "The prosecution did not offer a motive for why Patterson wanted to kill his friend, or why he would have chosen to return to the scene when he could have stayed home,"

304.    This is also false.

305.    In closing argument, Beth addressed this issue directly:

"Why does he come back to the scene? Number one, if your whole neighborhood sees you out there, if people hadn't seen the shooting and you see Dontia out there five minutes after the shooting you're providing an alibi for yourself, aren't you? Pretty smart. He also goes back because he wants to get the marijuana for whatever reason, whatever dispute had been going on there. And number three, he wants to get out there so he can get in Pierre and Allan Brunache's face so he can let them know that he knows and sure they keep their mouth's shut." (2008 Trial Tr. vol. 1, 204–205, Aug. 11, 2008).

306.    This reference to threatening behavior is corroborated by the testimony of the eyewitnesses also highlighted by Beth in her closing argument;

"Another quote from Mr. Laventure is: If this guy's going to shoot somebody in broad daylight at 12:30 p.m., what did you think he's going to do to me?" (2008 Trial Tr. vol. 1, 196, Aug. 11, 2008).

307.    Beth also did offer a motive during her closing argument. She detailed that the victim appeared to be involved in the drug trade, noting that he had a large amount of cash in small denominations on him. She pointed out that an eyewitness saw Patterson bend down to grab

something before he ran away, and that the first thing Patterson did upon returning to the scene was take a marijuana cigarette off the victim's body. As she stated: "He (Patterson) came back for that marijuana as if to say, it's not your corner, it's mine. ***That's what this case is about.***" (2008 Trial Tr. vol. 1, 210–211, August 11, 2008).

308.    These knowingly false claims about Beth's arguments at trial are yet more invented "additional" facts designed to portray the prosecution and her arguments as unsupported by evidence and illogical, thereby reinforcing the Report's narrative of prosecutorial misconduct.

309.    The Zimroth Report also suggest that Beth withheld impeachment evidence related to Officer Chandler.

310.    The Cummings Motion raises two issues concerning Chandler: (1) that she allegedly made inconsistent statements between the first and second trials, and (2) that the Commonwealth allegedly failed to disclose impeachment material that could have been used to challenge her credibility.

311.    Crucially, the Motion makes clear that both allegations relate exclusively to the second trial. It expressly notes that Chandler was not called as a witness in the first trial—where Beth served as lead prosecutor. As the Motion states unequivocally; "Although not called as a witness in the first trial, the Commonwealth called Eyvette Chandler…"

312.    Accordingly, the Motion does not attribute any misconduct concerning Chandler to Beth.

313.    Yet the Zimroth Report misleadingly states in its introduction that the investigation "discovered that homicide prosecutors did not disclose favorable impeachment information relating to a key prosecution witness."

314.    By using the plural term "prosecutors" and omitting the Motion's clear limitation to the second trial, the Report falsely implies that these allegations apply to Beth as well.

315.    The Zimroth Report is false and defamatory in its portrayal of the prosecution of Dontia Patterson. By characterizing the case as an illogical travesty of justice and misrepresenting the evidence, witness testimony, and arguments of counsel, the Report intentionally depicts Beth McCaffery as an unethical and dishonest prosecutor—someone driven not by a duty to seek justice, but by a willingness to persecute the innocent.

316.    The sole purpose of the Zimroth Report, with respect to Beth McCaffery, was to defame her, humiliate her, and ruin her reputation.

317.    On April 16, 2024, the Zimroth Center held its annual conference, titled "Prosecutorial Misconduct in the Philadelphia District Attorney's Office."

318.    The conference announcement included: "This year's conference focuses on the Zimroth Center's report on prosecutorial misconduct in the Philadelphia District Attorney's Office, which results from a research partnership with the Office. Philadelphia District Attorney Larry Krasner will give the keynote address, speaking about the report, its findings, and the importance of transparency and rebuilding the community's trust in the work of the Office."[2]

319.    Among the featured panelist was "Patricia Cummings, Zimroth Center research scholar and former CIU Supervisor at the Philadelphia, DA."

320.    The panel discussion promised a review of "the report's findings regarding prosecutorial misconduct…"

321.    Attendees at the panel discussion were offered New York State Continuing Legal Education credits.

---

[2] https://docket.law.nyu.edu/centers/zimroth-center-annual-conference-prosecutorial-misconduct-in-the-philadelphia-district-attorneys-office/56336/

322. The event was advertised online and drew a capacity crowd of over 300 people.

323. Despite the Inquirer and Judge Coyle's resounding vindication, the Zimroth Report is also known to have been distributed nationally and internationally and remains easily available on-line to this day.

324. Despite the obvious reasons to doubt the allegations in the Cummings Motion and the false description of the Patterson prosecution in the Zimroth Report, at no time did Cummings or anyone else at NYU or NYU Law School:

    a.  Ever attempt to interview Beth or Sax to learn of their version of events;

    b.  Ever attempt to interview Homicide Chief Voci, who himself signed and submitted to the Court the Cummings Motion;

    c.  Ever attempt to interview the surviving family of the victim in the Patterson murder case to understand their version of events;

    d.  Ever conduct any independent investigation of the Patterson murder and subsequent trials;

    e.  Ever take any steps to conduct a background check or ethical analysis of Cummings.

    f.  Ever conduct any independent assessment of the claims against Beth and more generally the many publicly available sources of information demonstrating that Cummings and Krasner's CIU were not reliable and were known to make unfounded allegations and purposely avoid the truth in order to protect pre-determined narratives designed specifically to attack and defame former prosecutors.

g.  Ever take any other steps to verify the facts or conclusions it published stating Beth was guilty of prosecutorial misconduct; or

h.  Correct the many false and defamatory accusations that were clearly contradicted by the records that the Defendants reviewed as a basis for the report.

325.    Rather, as demonstrated above, the Defendants reviewed the trial file and related records associated with the prosecution of Dontia Patterson, and knowingly chose to falsely report on the material facts within in order to serve the false narrative they were pursuing.

326.    Indeed, even after Judge Coyle's rulings – as outlined above – and even after the coverage of such rulings in various newspapers – including the Philadelphia Inquirer – and even after the many public reports of corrupt and dishonest post-conviction investigation conducted by Cummings and Krasner's office, NYU or NYU Law School:

a)  Never issued an amendment to the Zimroth Report, or even seek to clarify its accusations as to Beth;

b)  Never contacted Beth or Sax to interview them or further understand other views of the Patterson prosecutors;

c)  Never withdrew the Zimroth Report from the internet or elsewhere; and

d)  Never issued any form of apology or retraction to Beth or Sax.

327.    Directly as a result of Defendants' actions and inactions as described above, Beth's reputation continues to be permanently tarnished by the Zimroth Report, particularly since the Zimroth Report represents the product of a "prestigious university" and "nationally acclaimed" law school.

328.    The Zimroth Report is easily accessible to residents throughout the Philadelphia region, including in Bucks County, where Beth grew up, attended school, and where her parents still reside.

329.    Now that Beth's children are older and attending school full-time, any ability of Beth returning to her professional passion of being a prosecutor has been utterly foreclosed directly as a result of the conduct of Defendants herein and the widespread ongoing defamation of Beth's character and reputation.

330.    Beth's earning capacity as a lawyer has been completely eliminated directly as a result of the malicious and outrageous conduct of the Defendants.

331.    As intended the Report has diminished her future professional prospects.

332.    The Zimroth Report defaming Beth is not only still available online it has been cited dozens of times in other publications around the world.

333.    The conduct – and failures to act – of NYU and NYU Law as detailed herein represent a shocking and outrageous deliberate and reckless disregard for the truth.

334.    Despite having obvious reasons to doubt the truth of Cummings' allegations about Beth, Defendants purposely avoided the truth by refusing to contact known and readily available sources of information which would have directly contradicted the false allegations.

335.    The aforementioned misconduct is particularly egregious given the nature of the NYU defendants, that is, as so-called "elite" institutions responsible for the propagation and reinforcement of the rule of law and the importance of due process.

<u>COUNT I</u>
Defamation
(Plaintiff v. All Defendants)

336.    Plaintiff incorporates by reference all other paragraphs of the Complaint as though set forth fully herein.

337.    The Defamatory Statements described above, alone or in combination, have defamatory character and are per se defamatory for the following reasons, among others:

    a.  they ascribe to Plaintiff conduct, character, or a condition that adversely reflects upon, and have and will adversely reflect upon, her fitness and/or perceived fitness to be in any position of trust, including as an attorney.

    b.  they ascribe to Plaintiff acts and failures to act that are improper and unlawful and impugn her integrity and blacken her personal and professional reputation;

    c.  they expose Plaintiff to hatred, contempt, or ridicule, and injure her in her business and/or profession; and

    d.  they lower Plaintiff in the estimation of the recipients of the statements and deter third persons including potential employers, clients, and co-workers from associating with and/or engaging with her or employing her in any capacity.

338.    The accusation that Beth was guilty of "hiding evidence" is an explicit accusation of criminal conduct.

339.    The false description of Beth pursing a murder prosecution on flimsy eyewitness testimony, making illogical arguments, ignoring credible alibi testimony, and other false representations about the prosecution of Patterson all cast Beth as someone willing to prosecute an innocent man.

340.    Any and all persons who have read or heard, or will read or hear the above Defamatory Statements understood, and will understand, the same as having a defamatory meaning.

341.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another, understood, and will understand, the same as having defamatory meaning.

342.    Any and all persons who have read or heard or will read or hear the above Defamatory Statements will understand that the same applies to Plaintiff.

343.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another understood, and will understand, that the same applies to Plaintiff.

344.    The above Defamatory Statements are false.

345.    Defendant Cummings was at all material times acting within the course and scope of her employment and/or agency with NYU and/or NYU Law in preparing the false and defamatory Zimroth Report.

346.    NYU and/or NYU Law are vicariously liable for the conduct of Cummings, who, at all times material hereto, was an employee and/or authorized agent of NYU and NYU Law, which describes Cummings as an NYU "Research Scholar."

347.    Defendants knew, when they published the above Defamatory Statements, that they were false or at a minimum Defendants had serious doubts that the statements as to Beth were false and purposely avoided any information that undermined their defamatory claims.

348.    By way of example only, despite having serious reasons to doubt the truth of the defamatory statements as to Beth, Defendants refused:

      a.  to interview or even contact Beth to determine whether she had disclosed exculpatory information to the defense in the Patterson case;

      b.  to interview or even contact Sax to determine what information he had about Beth or Sax disclosing exculpatory information to the defense in the Patterson case;

c.  to interview or even contact other relevant witnesses in the Patterson case.

349.    Instead of seeking truth, Defendants tried to conceal the unreliability of their false statements by cherry-picking documents in order to give their false claims the veneer of credibility, while overtly falsifying the material facts and statements from other records associated with the proceedings.

350.    Cummings knew that the statements about Beth in the Cummings Motion were false, yet she nonetheless included them in the Zimroth Report.

351.    Cummings also knew that the statements in the Zimroth Report detailing the first trial of Dontia Patterson, including those that did not come from the Cummings Motion, were false.

352.    Defendants, through their agent Cummings, delivered and published the Defamatory Statements with actual malice and/or a reckless disregard for the truth of the statements expressed therein.

353.    As a direct and proximate result of the delivery and publication of the Defamatory Statements, Plaintiff has suffered injury, including, but not limited to:

a.  The Defamatory Statements ascribe to Plaintiff conduct, character, or a condition that adversely reflects upon, and have and will adversely reflect upon, her fitness and/or perceived fitness to be in any position of trust, including as an attorney;

b.  the Defamatory Statements ascribe to Plaintiff acts and failures to act that are improper and unlawful and impugn her integrity and blacken her personal and professional reputation;

c. the Defamatory Statements expose Plaintiff to hatred, contempt, or ridicule, and injure her in her business and/or profession;

d. the Defamatory Statements lower Plaintiff in the estimation of the recipients of the statements and deter third persons including potential employers, clients, and co-workers from associating with and/or engaging with her or employing her in any capacity;

e. Devasting, sustained mental suffering; and

f. Elimination of any remaining earning capacity as a lawyer or judge.

WHEREFORE, Plaintiff requests judgment in her favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate her, together with punitive damages, interest, costs of suit, and such further relief deemed equitable and just.

COUNT II
False Light
(Plaintiff v. All Defendants)

354. Plaintiff incorporates by reference all other paragraphs of the complaint as though set forth fully herein.

355. All the above statements were false and Defendants maliciously disregarded the falsity of such statements.

356. Defendants made these statements with the intent of harming Plaintiff's reputation in the eyes of her peers and members of her community so that Beth would be deemed dishonest and regarded as a person of low moral character who would violate the constitution in order to convict an innocent man.

357. These include the false claim that she hid evidence and the false description of Beth pursing a murder prosecution on flimsy eyewitness testimony, making illogical arguments,

ignoring credible alibi testimony, and other false representations about the prosecution of Patterson all cast Beth as someone willing to prosecute an innocent man.

358.    This conduct is among the most reprehensible behavior that could be ascribed to an attorney and is borderline criminal.

359.    As a direct and proximate cause of said false statements, Beth's reputation has been damaged and her earning capacity has been greatly diminished.

360.    The statements were made with the intent that Beth's peers and community would receive it in particular.

361.    Defendants intentionally cast Beth in a false light by falsely stating that she committed egregious prosecutorial misconduct and knowingly and/or recklessly disregarded the constitutional rights of a criminal defendant.

362.    Defendants' false statements described above casting Beth in a false light would be highly offensive to a reasonable person.

363.    The false statements were published to a wide public audience, including on NYU's website, and promotions for the NYU conference in April 2024.

364.    As a direct and proximate result of Defendants casting Beth in a false light, Beth has suffered severe and permanent damage as set forth above.

WHEREFORE, Plaintiff requests judgment in her favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate her, together with punitive damages, interest, costs of suit, and such further relief deemed equitable and just.

COUNT III
Intentional Infliction of Emotional Distress
(Plaintiff v. All Defendants)

365.    Plaintiff incorporates by reference all other paragraphs of the complaint as though set forth fully herein.

366.    The conduct of the Defendants – knowingly disseminating lies about Beth, falsely accusing her of unethical and criminal conduct with the intent of convicting an innocent man -- was extreme and outrageous.

367.    Defendants intended to cause Beth emotional distress or acted recklessly to the likelihood that their actions would cause emotional distress.

368.    As a direct and proximate result of Defendants' conduct, Beth suffered severe and permanent emotional distress, as well as physical harm, including suffering from insomnia, headaches, nightmares, nervousness and anxiety.

WHEREFORE, Plaintiff requests judgment in her favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate her, together with punitive damages, interest, costs of suit, and such further relief deemed equitable and just.

COUNT IV
Civil Conspiracy
(Plaintiff v. All Defendants)

367.    Plaintiff incorporates by reference all other paragraphs of the complaint as though set forth fully herein.

368.    In the event NYU and/or NYU Law disclaim vicarious liability for Cummings as their agent or employee, all Defendants are nevertheless liable as civil conspirators.

369.    All Defendants had a common purpose of unlawfully authoring, publishing, promoting, and distributing false and defamatory statements of and concerning Plaintiff with actual malice.

370.    As set forth fully above, all Defendants knew or should have known that the statements about Plaintiff and the characteristics attributed to Plaintiff were false, and took overt acts in furtherance of their common goals and purposes.

371.    However, in an effort to author, publish, promote, and distribute such false defamatory statements, Defendants ignored and purposely avoided the truth and/or purposely made false statements about Plaintiff with malice and without legal justification.

372.    Defendant NYU Law had the express purposes of outing prosecutors to accuse them of misconduct.

373.    NYU and NYU Law allowed Cummings to act with impunity despite clear public evidence that she was unreliable, unethical and lacking in credibility.

374.    All Defendants each benefitted from the publication of the false defamatory statements.

375.    As a direct and proximate result of Defendants' unlawful acts and conspiracy to defame and cast Plaintiff in a false light, she has suffered substantial harm and damage to her reputation.

376.    As a further direct and proximate cause of Defendants' actions, Plaintiff has suffered and will continue to suffer severe emotional and psychological harm, as well as loss of standing within her chosen profession.

377.    Defendants' conduct as described herein was clearly outrageous, shocking, intentional, and done with actual malice, justifying punitive damages.

WHEREFORE, Plaintiff requests judgment in her favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate her, together with punitive damages, interest, costs of suit, and such further relief deemed equitable and just.

**BOCHETTO & LENTZ, P.C.**

Dated: July 31, 2025

By:    /s/ George Bochetto
       GEORGE BOCHETTO, ESQUIRE
       DAVID P. HEIM, ESQUIRE
       BRYAN R. LENTZ, ESQUIRE
       KEAN C. MAYNARD, ESQUIRE
       Attorneys for Plaintiff