IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------- x

BETH ANN McCAFFERY,                          :
                                             :
                 Plaintiff,                  :
                                             :
        - against -                          :        No. 2:25-cv-02429-JFM
                                             :
NEW YORK UNIVERSITY SCHOOL OF LAW,           :
NEW YORK UNIVERSITY, PATRICIA                :
CUMMINGS, JOHN DOE, and JANE DOE             :
                                             :
                 Defendants.                 :
------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................................... 3

        A.      The Parties ................................................................................................ 3

        B.      Patterson Is Unsuccessfully Prosecuted in 2008 and Convicted in 2009 .............. 4

        C.      Patterson's Conviction Is Vacated, the DAO Moves for *Nolle Prosequi*, and
                the Court Grants the Motion ................................................................... 4

        D.      NYU's Zimroth Center Publishes Its Report on Prosecutorial Misconduct .......... 7

        E.      McCaffery Sues NYU and Cummings ................................................................. 9

III.    ARGUMENT ..................................................................................................... 11

        A.      New York Law Applies to Defendants' Fair-Report Privilege ........................... 13

                1.      Pennsylvania Choice-of-Law Principles .................................................... 14

                2.      The Choice-of-Law Factors Weigh Heavily in Favor of Applying
                        New York's Fair-Report Privilege ............................................................ 16

        B.      The Amended Complaint Must Be Dismissed Because the Report Is
                Protected Under New York's Fair-Report Privilege ........................................ 19

                1.      The Report Is a Substantially Accurate Description of the
                        Proceedings ........................................................................................ 20

                2.      Defendants Did Not Institute a Proceeding for the Sole Purpose of
                        Later Defaming McCaffery .................................................................. 26

        C.      Alternatively, the Amended Complaint Must Be Dismissed Because the
                Report Is Protected Under Pennsylvania's Fair-Report Privilege ..................... 29

        D.      The Fair-Report Privileges Doom McCaffery's Remaining Claims ................... 32

        E.      The Anti-SLAPP Statute Entitles Defendants to Attorneys' Fees ..................... 34

IV.     CONCLUSION ................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*,
  2016 WL 2642224 (S.D.N.Y. May 6, 2016) ........................................................19

*Abraham v. Greater New Castle Cmty. Fed. Credit Union*,
  2016 WL 1161217 (W.D. Pa. Mar. 23, 2016) ......................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................11

*Bauer v. Baud*,
  2023 WL 2307413 (S.D.N.Y. Mar. 1, 2023) .......................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................11

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006)...................................................................................7

*Berg Chilling Sys., Inc. v. Hull Corp.*,
  435 F.3d 455 (3d Cir. 2006) (Alito, J.) .........................................................14, 15

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012).................................................................20

*Bobulinski v. Tarlov*,
  758 F. Supp. 3d 166 (S.D.N.Y. 2024).................................................................35

*Branca v. Mayesh*,
  476 N.Y.S.2d 187 (App. Div. 1984), *aff'd*, 473 N.E.2d 261 (N.Y. 1984)..................20, 26, 30

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)...................................................................................3

*BYD Co. Ltd. v. VICE Media LLC*,
  531 F. Supp. 3d 810 (S.D.N.Y. 2021),
  *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) ..................................................19

*Catalanello v. Kramer*,
  18 F. Supp. 3d 504 (S.D.N.Y. 2014)....................................................................12

*Cheney v. Daily News L.P.*,
  654 F. App'x 578 (3d Cir. 2016) ..........................................................................33

*Chin v. Chrysler LLC*,
    538 F.3d 272 (3d Cir. 2008)..................................................................................34

*Cholowsky v. Civiletti*,
    887 N.Y.S.2d 592 (App. Div. 2009) .............................................................21, 23, 25

*Com. v. Reinhart*,
    353 A.2d 848 (Pa. 1976) .....................................................................................28

*Corman v. Nationwide Life Ins. Co.*,
    396 F. Supp. 3d 530 (E.D. Pa. 2019) ......................................................................3

*Cowley v. Pulsifer*,
    137 Mass. 392 (1884) .........................................................................................13

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
    551 F. Supp. 3d 320 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned
    Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) .................21, 22, 23, 25

*Cummings v. City of New York*,
    2020 WL 882335 (S.D.N.Y. Feb. 24, 2020)......................................................19, 20

*D'Annunzio v. Ayken, Inc.*,
    876 F. Supp. 2d 211 (E.D.N.Y. 2012) ...............................................................20, 26

*Dorval v. Fitzsimmons*,
    2020 WL 376989 (D.V.I. Jan. 23, 2020) ..................................................................3

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
    623 F. Supp. 1038 (E.D.N.Y. 1985), *aff'd*, 806 F.2d 392 (2d Cir. 1986)..............................23

*First Lehigh Bank v. Cowen*,
    700 A.2d 498 (Pa. Super. 1997)......................................................................12, 30, 32

*Ford v. Levinson*,
    454 N.Y.S.2d 846 (App. Div. 1982) .......................................................................23

*Friedman v. Bloomberg L.P.*,
    180 F. Supp. 3d 137 (D. Conn. 2016),
    *aff'd in relevant part*, 884 F.3d 83 (2d Cir. 2017) ....................................................19

*Friedman v. Bloomberg L.P.*,
    884 F.3d 83 (2d Cir. 2017)...............................................................................19, 32

*Friedman v. Isr. Labour Party*,
    957 F. Supp. 701 (E.D. Pa. 1997) .........................................................................29

*Frydman v. Verchleiser*,
   172 F. Supp. 3d 653 (S.D.N.Y. 2016) .................................................................28

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
   669 F. Supp. 2d 405 (S.D.N.Y. 2009) ...........................................................20, 21

*GEICO v. Glassco Inc.*,
   2021 WL 4391717 (M.D. Fla. Sept. 24, 2021) ..................................................35

*Goguen v. NYP Holdings, Inc.*,
   544 P.3d 868 (Mont. 2024) ..............................................................16, 17, 18, 19

*Griffith v. United Air Lines, Inc.*,
   203 A.2d 796 (Pa. 1964) ....................................................................................15

*Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*,
   2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009) ......................................................27

*Hanft v. Heller*,
   316 N.Y.S.2d 255 (Sup. Ct. 1970) ....................................................................21

*Haynes v. Bonner*,
   130 N.Y.S.3d 899 (Sup. Ct. 2020) ....................................................................28

*Hilferty v. Chevrolet Motor Div. of Gen. Motors Corp.*,
   1996 WL 287276 (E.D. Pa. May 30, 1996) .......................................................34

*Hoelzle v. Vensure Emp. Servs., Inc.*,
   2022 WL 3588025 (E.D. Pa. Aug. 22, 2022) .....................................................34

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   399 N.E.2d 1185 (N.Y. 1979) ............................................................................20

*Hoy v. Angelone*,
   720 A.2d 745 (Pa. 1998) ....................................................................................33

*Hudak v. Times Pub. Co.*,
   534 F. Supp. 2d 546 (W.D. Pa. 2008) ...............................................................30

*I.M. Wilson, Inc. v. Otvetstvennostyou*,
   500 F. Supp. 3d 380 (E.D. Pa. 2020) ......................................................29, 30, 31

*Idema v. Wager*,
   120 F. Supp. 2d 361 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002) .......................16

*Immuno A.G. v. Moor-Jankowski*,
   537 N.Y.S.2d 129 (App. Div. 1989), *aff'd*, 549 N.E.2d 129 (N.Y. 1989),
   *vacated on other grounds*, 497 U.S. 1021 (1990) ...............................................12

*James v. City of Wilkes-Barre*,
    700 F.3d 675 (3d Cir. 2012)................................................................11

*Karaduman v. Newsday, Inc.*,
    416 N.E.2d 557 (N.Y. 1980) ............................................................12

*Keogh v. N.Y. Herald Trib., Inc.*,
    274 N.Y.S.2d 302 (Sup. Ct. 1966), *aff'd*, 285 N.Y.S.2d 262 (App. Div. 1967)....................25

*Kesner v. Dow Jones & Co.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021).........................................17, 19

*King v. Phila. Inquirer*,
    2007 WL 9813083 (E.D. Pa. Nov. 28, 2007) .........................................9, 29

*Kinsey v. N.Y. Times Co.*,
    2020 WL 1435141 (S.D.N.Y. Mar. 23, 2020), *aff'd*, 991 F.3d 171 (2d Cir. 2021)...............19

*Kinsey v. N.Y. Times Co.*,
    991 F.3d 171 (2d Cir. 2021)............................................... *passim*

*Knipe v. SmithKline Beecham*,
    583 F. Supp. 2d 602 (E.D. Pa. 2008) ........................................14

*L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
    844 F.2d 955 (2d Cir. 1988)...............................................26

*Lee v. TMZ Prods. Inc.*,
    710 F. App'x 551 (3d Cir. 2017) ...........................................13, 33

*McDonald v. E. Hampton Star*,
    781 N.Y.S.2d 694 (App. Div. 2004) .........................................21

*Medico v. Time, Inc.*,
    643 F.2d 134 (3d Cir. 1981)...............................................13, 32

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974)......................................................25

*Miller v. Gizmodo Media Grp., LLC*,
    2019 WL 1790248 (S.D. Fla. Apr. 24, 2019) ..................................17, 18

*Misek-Falkoff v. Am. Law. Media, Inc.*,
    752 N.Y.S.2d 647 (App. Div. 2002) ........................................33

*Misek-Falkoff v. McDonald*,
    177 F. Supp. 2d 224 (S.D.N.Y. 2001), *aff'd*, 63 F. App'x 551 (2d Cir. 2003).......................33

*Monge v. Univ. of Pa.*,
    2023 WL 3571935 (E.D. Pa. May 19, 2023) .................................................14, 29, 33

*Mosley v. Observer Pub. Co.*,
    629 A.2d 965 (Pa. Super. 1993)....................................................................................30

*Mulder v. Donaldson, Lufkin & Jenrette*,
    611 N.Y.S.2d 1019 (Sup. Ct. 1994), *aff'd*, 623 N.Y.S.2d 560 (App. Div. 1995)...................20

*Murray v. Shaw*,
    2025 WL 915752 (D.D.C. Mar. 26, 2025)..................................................................29

*Myers v. City of Wilkes-Barre*,
    448 F. Supp. 3d 400 (M.D. Pa. 2020) ..........................................................................35

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................................................12

*Orawsky v. Jersey Cent. Power & Light Co.*,
    472 F. Supp. 881 (E.D. Pa. 1977) ................................................................................15

*Pace v. Baker-White*,
    432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021) ......................12

*Parks Miller v. Centre County*,
    2016 WL 2752645 (M.D. Pa. May 11, 2016), *aff'd*, 702 F. App'x 69 (3d Cir. 2017) ............12

*Paucek v. Shaulis*,
    349 F.R.D. 498 (D.N.J. 2025).................................................................................34, 35

*Rakofsky v. Wash. Post*,
    971 N.Y.S.2d 74 (Sup. Ct. 2013) .................................................................................21

*Reilly v. N. Hills News Rec.*,
    1998 WL 1113472 (W.D. Pa. Oct. 26, 1998) ..............................................................29

*Riel v. Morgan Stanley*,
    2007 WL 541955 (S.D.N.Y. Feb. 16, 2007), *aff'd*, 299 F. App'x 91 (2d Cir. 2008) ........26, 27

*RiteScreen Co., LLC v. White*,
    2024 WL 454945 (M.D. Pa. Feb. 6, 2024) ..................................................................29

*Saleh v. N.Y. Post*,
    915 N.Y.S.2d 571 (App. Div. 2010) .............................................................................25

*Salerno v. Phila. Newspapers, Inc.*,
    546 A.2d 1168 (Pa. Super. 1988)..................................................................................33

*Sarpolis v. Tereshko*,
    26 F. Supp. 3d 407 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 594 (3d Cir. 2016) ........................34

*Sassower v. N.Y. Times Co.*,
    852 N.Y.S.2d 180 (App. Div. 2008) .....................................................................................25

*Sciandra v. Lynett*,
    187 A.2d 586 (Pa. 1963) ...............................................................................................29, 30

*Sec. Mut. Life Ins. Co. of N.Y. v. Contemp. Real Est. Assocs.*,
    979 F.2d 329 (3d Cir. 1992)..................................................................................................34

*SentosaCare LLC v. Lehman*,
    95 N.Y.S.3d 126 (Sup. Ct. 2018) .........................................................................................22

*Sourovelis v. City of Philadelphia*,
    246 F. Supp. 3d 1058 (E.D. Pa. 2017) .................................................................................11

*Tacopina v. O'Keeffe*,
    645 F. App'x 7 (2d Cir. 2016) .............................................................................................23

*United States v. DeLeon*,
    428 F. Supp. 3d 841 (D.N.M. 2019),
    *aff'd sub nom. United States v. Herrera*, 51 F.4th 1226 (10th Cir. 2022) ...........................8, 31

*United States v. Kindred Healthcare, Inc.*,
    469 F. Supp. 3d 431 (E.D. Pa. 2020) ...................................................................................4

*Wexler v. Allegion (UK) Ltd.*,
    374 F. Supp. 3d 302 (S.D.N.Y. 2019)......................................................................19, 28, 33

*Wilkow v. Forbes, Inc.*,
    2000 WL 631344 (N.D. Ill. May 15, 2000),
    *aff'd*, 241 F.3d 552 (7th Cir. 2001)...........................................................16, 17, 19, 21

*Williams v. WCAU-TV*,
    555 F. Supp. 198 (E.D. Pa. 1983) ........................................................................................30

*Williams v. Williams*,
    246 N.E.2d 333 (N.Y. 1969)..........................................................................................26, 27

*Wilson v. Slatalla*,
    970 F. Supp. 405 (E.D. Pa. 1997) .......................................................................................29

*Zappin v. Daily News, L.P.*,
    2017 WL 3425765 (S.D.N.Y. Aug. 9, 2017).......................................................................20

**Statutes and Rules**

18 Pa. Cons. Stat.
  § 9101.............................................................................................................11

42 Pa. Cons. Stat.
  § 8340.11.......................................................................................................34
  § 8340.12.......................................................................................................34
  § 8340.13...................................................................................................34, 35
  § 8340.14...................................................................................................34, 35
  § 8340.15...................................................................................................34, 35
  § 8340.18...............................................................................................1, 34, 35
  § 8932...........................................................................................................28

N.Y. Civ. Rights Law § 74 ...............................................................13, 19, 28, 33

Fed. R. Civ. P. 12 ..................................................................................1, 11, 35

Pa. R. Crim. P. 585 .................................................................................28

**Other Authorities**

Adam M. Gershowitz, *Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct*, 42 U.C. DAVIS L. REV. 1059 (2009) ............................................8, 31

Michael Berry & Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough Anti-SLAPP Protections: The New Uniform Public Expression Protection Act*, 96 PA. B.A. Q. 1 (2025) ......................................................................34

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 ............................................15, 17

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 ..........................................15, 18

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 163 ...............................................15

Defendants New York University ("NYU")[1] and Patricia Cummings jointly move to dismiss the Amended Complaint (Dkt. 26) with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and for attorneys' fees, costs, and expenses pursuant to 42 Pa. Cons. Stat. § 8340.18(a).

## I.    PRELIMINARY STATEMENT

Plaintiff Beth Ann McCaffery, a former Philadelphia Assistant District Attorney ("ADA"), brings this defamation action against NYU and Cummings over a March 2024 academic report ("Report") by NYU Law's Peter L. Zimroth Center on the Administration of Criminal Law ("Zimroth Center"). The 180-page Report chronicled the history of prosecutorial misconduct in the Philadelphia District Attorney's Office ("DAO"), the largest district attorney's office in the Commonwealth and among the largest in the nation. The 33-page body of the Report examined the historic culture and contemporary state of the DAO, the constitutional duties of prosecutors, examples of violations of those duties, and recommendations for reform to the DAO to prevent further violations. McCaffery was not mentioned in the body of the Report.

Appended to the Report was a 146-page Case Appendix summarizing 52 cases over five decades where courts and/or the DAO's Conviction Integrity Unit ("CIU") determined that constitutional violations occurred. One of the 52 cases described in the Case Appendix was the 2018 exoneration of Dontia Patterson after his 2008–2009 homicide trial and retrial. In approximately two pages, the Case Appendix recounted the history of Patterson's case and the DAO's allegations of misconduct against the two prosecutors who handled his two trials: McCaffery, who handled Patterson's first trial that ended in a mistrial, and ADA Richard Sax, who secured Patterson's conviction in the second trial. Critically, the entire summary was drawn from the DAO's successful 2018 motion to *nolle prosequi* or dismiss the charges against Patterson ("Nol

_____

[1] Putative Defendant New York University School of Law ("NYU Law") is not a juridical entity separate from NYU. Rather, it is a school within NYU.

Pros Motion"), the Nol Pros Motion hearing, the jury trial, and media reports.

In this lawsuit, McCaffery challenges certain statements in the Case Appendix's summary of *Patterson*. Her claims fail because the challenged statements are a substantially accurate description of the *Patterson* proceedings, which ended in dismissal based on findings of prosecutorial misconduct and Patterson's likely innocence. In her Amended Complaint, McCaffery complains that the Report should have portrayed her trial advocacy more positively, citing and attaching about 2,000 pages of trial transcripts that supposedly demonstrate the strength of her (unsuccessful) prosecution. But Defendants had no obligation to parse thousands of pages or to portray the trial in the light preferred by McCaffery—particularly when the successful Nol Pros Motion filed by her own office concluded that her case was "weak" and "illogical." Ex. A at 3 (also attached to Am. Compl. as Ex. 1).[2] All that Defendants were obligated to do was publish a substantially accurate summary of the proceedings. Because Defendants did so, they are shielded from liability under both New York's and Pennsylvania's fair-report privilege.

The Report is precisely the type of publication that New York's and Pennsylvania's fair-report privilege protects. While McCaffery attempts to invoke narrow exceptions to the privilege, such an exception may apply only if the *sole* purpose of the *Patterson* proceeding (under New York law), or the *sole* purpose of the Zimroth Center's Report (under Pennsylvania law), was to defame her. McCaffery does not and cannot plausibly allege either exception. The court-approved purpose of the Nol Pros Motion was to decline to proceed with a third trial of an exonerated man—not to defame McCaffery six years after the fact in an academic report. And the express purpose of the Report was to improve fairness and public safety through criminal justice reforms, informed

---

[2] Citations to alphabetical exhibits are to those attached to the Chase Declaration filed herewith. Citations to numerical exhibits are to those attached to the Amended Complaint (Dkt. 26).

by 52 case studies of misconduct by "over 40 former prosecutors." Am. Compl. ¶ 226. The implausible notion that the proceeding or the Report was intended solely to defame McCaffery is belied by the court record and her own allegations. Her claims fail as a matter of law.

Defendants understand that no lawyer wants to be accused of misconduct. But the Nol Pros Motion—the original source of the accusations—was filed and granted seven years ago. The time to challenge the statements in the Nol Pros Motion or the news articles about it has long passed. The Zimroth Center had every right to report accurately on the proceedings under the fair-report privilege. And the Report did precisely that. Defendants should not be forced to devote additional time and resources to defending a meritless lawsuit targeting the exercise of their First Amendment rights. This Court should dismiss the Amended Complaint with prejudice and award Defendants' fees under Pennsylvania's anti-SLAPP law.

## II. FACTUAL BACKGROUND[3]

### A. The Parties

Plaintiff Beth McCaffery is a former ADA in the DAO. Am. Compl. ¶ 6.

Defendant NYU is a nonprofit research university in New York with a law school specializing in legal education and research. Am. Compl. ¶¶ 34–35. The mission of the Zimroth Center at NYU Law is to promote good government practices in criminal matters at all levels of government through academic and public policy research. Ex. G at 181.[4]

---

[3] The facts are drawn from the allegations in the Amended Complaint, "documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the complaint, items subject to judicial notice, [or] matters of public record," all of which the Court may consider on a motion to dismiss. *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp. 3d 530, 535 (E.D. Pa. 2019) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)).

[4] On a motion to dismiss defamation and related claims, the Court can consider the Report at issue, which is "incorporated by reference or integral to the claim." *Dorval v. Fitzsimmons*, 2020 WL 376989, at *3 & n.3 (D.V.I. Jan. 23, 2020) (quoting *Buck*, 452 F.3d at 260); Am. Compl. ¶150 n.1.

Defendant Patricia Cummings is a former supervisor in the DAO who was hired to lead the CIU in 2018. Am. Compl. ¶¶ 33, 46, 49 & Ex. 4. The Amended Complaint alleges that Cummings drafted, but did not sign or file, the Nol Pros Motion. *Id.* ¶ 14; Ex. A at 11–12. It further alleges that in 2020 Cummings became a research fellow at the Zimroth Center. Am. Compl. ¶ 147. In its "Acknowledgements," the Report thanked Cummings, among others, "for their assistance with research and in drafting the report." Ex. G at pmbl.; Am. Compl. ¶ 236.

### B.    Patterson Is Unsuccessfully Prosecuted in 2008 and Convicted in 2009

In 2008, McCaffery served as lead prosecutor in the criminal trial of Dontia Patterson for the murder of Antwine Jackson. Am. Compl. ¶ 51; Ex. A at 2. McCaffery failed to secure a conviction of Patterson, as the 2008 trial ended in a hung jury. Am. Compl. ¶ 51.

In 2009, ADA Richard Sax retried and obtained the conviction of Patterson for first-degree murder and related charges. *Id.* ¶¶ 50–51. Patterson was sentenced to life in prison. *Id.* ¶ 50.

### C.    Patterson's Conviction Is Vacated, the DAO Moves for *Nolle Prosequi*, and the Court Grants the Motion

In February 2018, Patterson's conviction was vacated and a new trial was granted based on a finding of ineffective assistance of counsel. Am. Compl. ¶ 57; Ex. A at 4. The finding was based principally on the failure of Patterson's trial counsel to call an eyewitness who had informed police on multiple occasions that Patterson was *not* the person he saw shoot Jackson. Ex. A at 4. Patterson was released on bail the following month. Ex. B at 11:3.[5]

On May 15, 2018, rather than retry Patterson for a third time, the DAO filed the Nol Pros Motion to dismiss the charges. Am. Compl. ¶ 55; Ex. A. ADA Anthony Voci, then-Chief of the

---

[5] "[T]he Court may take judicial notice of public records" and public "court filings," such as the transcripts of the nol-pros hearing and the trial in the *Patterson* proceedings. *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 438 n.3 (E.D. Pa. 2020). Additionally, the nol-pros transcript is incorporated by reference into the Amended Complaint (Am. Compl. ¶ 251), and the trial transcripts are attached to the Amended Complaint (Exs. 5–6).

DAO's Homicide Unit, signed and verified the Nol Pros Motion. Am. Compl. ¶ 56; Ex. A at 11–12. As set forth in the Nol Pros Motion, after extensively reviewing and investigating the case, the DAO determined: (1) Patterson was "probably innocent," and (2) the case was "lacking in integrity." Ex. A at 1, 5.

With regard to Patterson's probable innocence, the DAO wrote that he had "no motive" for the murder, he "was not the shooter[,] and he was not involved in the crime." *Id.* at 3, 10. Rather, the "actual shooter" was involved in a drug feud with the victim. *Id.* at 8.

With regard to the case's lack of integrity, the Nol Pros Motion stated that the conviction was an "egregious example of police and prosecutorial misconduct." *Id.* at 2. Specifically, it stated that, before both trials, prosecutors improperly withheld exculpatory evidence from the defense—including evidence identifying the actual shooter as an alternate suspect. *Id.* at 8. According to the Nol Pros Motion, this withheld evidence included: (1) a police "white paper" containing detailed information from a confidential source that the victim was killed over a drug feud involving three people, including the actual shooter; (2) police notes of two unrecorded witness interviews naming the shooter; (3) two police photo arrays containing a photograph of the shooter; (4) a police memorandum reporting that unidentified males living in the same apartment complex as the shooter may have been responsible for the murder; and (5) evidence impeaching a witness (Officer Eyvette Chandler) who testified at the second trial. *Id.* at 8–11. The Nol Pros Motion stated that, had the exculpatory evidence been disclosed to and used by trial counsel, the jury would not have convicted Patterson. *Id.* at 11.

The Nol Pros Motion called the prosecution's theory and case against Patterson "illogical" because, among other things, "[w]ithin minutes of the killing, Patterson was seen in the street near his friend, Jackson. Patterson was distraught. Killers do not usually remain or return to the scene

of the crime. They do not usually cry out for their victims while possible witnesses and police approach." *Id.* at 3. The Nol Pros Motion explained, "Violations of *Brady* often occur in weak cases. The case against Patterson was weak. Without concealment of exculpatory evidence, the prosecution could not win. And in all serious cases, prosecutors feel pressure to win. Some feel the ends justify the means." *Id.* The Nol Pros Motion alleged that "both trial prosecutors involved in the case" must have known of the exculpatory evidence yet failed to disclose it. *Id.* at 2–3.

On May 16, 2018, the Court of Common Pleas held a hearing on the Nol Pros Motion. At the hearing, ADA Voci forcefully reiterated the arguments in the Motion, including how the ADAs in charge of the *Patterson* case had engaged in prosecutorial misconduct. Ex. B at 5:16–9:19. For instance, he described the case as "weak" and "so lacking in integrity," with "no motive" and "no physical evidence of any kind to link Mr. Patterson to th[e] killing," that "any fair-minded honest, sincere dedicated prosecutor committed to justice would be troubled." *Id.* at 4:20–6:9. After considering "the information . . . provided" by the DAO and its "responsibilities to carry out its duties," the court granted the Nol Pros Motion. *Id.* at 12:4–9.

Although the Nol Pros Motion did not name McCaffery and Sax, their appearances as the trial prosecutors in *Commonwealth v. Patterson* are matters of public record. *See, e.g.*, Ex. C at 2 (McCaffery appearing as counsel for the Commonwealth). Media outlets quickly identified them as the prosecutors accused of withholding evidence. Am. Compl. ¶ 86; Ex. D at 3 (*Phila. Inquirer* article) (also attached to Am. Compl. as Ex. 2). Sax offered extensive comments to the media defending his and McCaffery's actions and denying any wrongdoing. Ex. D at 3–5. The press noted, however, that McCaffery could not be reached for comment. *Id.* at 4. "Before long, the accusations gained local, national, and even international attention." Am. Compl. ¶ 89; *see, e.g.*,

Ex. E (another *Phila. Inquirer* article); Ex. F (*N.Y. Times* article).[6]

### D.    NYU's Zimroth Center Publishes Its Report on Prosecutorial Misconduct

In March 2024—six years after the grant of the Nol Pros Motion and the attendant media coverage—the Zimroth Center published its 180-page Report entitled *Prosecutorial Misconduct in the Philadelphia District Attorney's Office*.  Am. Compl. ¶ 17; Ex. G.  The Report defined "prosecutorial misconduct" as cases in which the CIU or a court found that prosecutors (1) withheld favorable information from the defense or (2) presented or failed to correct false evidence at trial.  Ex. G at 9.  Based on these criteria, the Report identified 52 cases of prosecutorial misconduct at the DAO, involving over 40 different prosecutors serving under different elected District Attorneys over 44 years.  Am. Compl. ¶ 226; Ex. G at 1, 3.  *Patterson* was just one of these 52 cases, and McCaffery and Sax were just two of the approximately 40 named prosecutors.

The Zimroth Center's research identified "common themes and fact patterns" that "contributed to or enabled the misconduct," including, among other things, a frequent failure to disclose alternate suspects, overreliance on cooperators and jailhouse informants, and a lack of accountability or sanctions for prosecutors.  Ex. G at 18–26.  The *Patterson* case was cited among dozens of others as examples of two of these themes.  *Id.* at 19–20.  Several other prosecutors— but not McCaffery—were named in examples of these factors.  *Id.* at 23–26.

As the Report explained, the Zimroth Center's research and advocacy sought to promote two broad goals: (1) to improve fairness in the criminal justice system by lessening the likelihood that innocent people are convicted of crimes they did not commit or based on insufficient evidence,

---

[6] The Court may "take judicial notice of newspaper articles" for the limited purpose of indicating "what was in the public realm at the time, not whether the contents of those articles were in fact true."  *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).  McCaffery also concedes that she handled Patterson's first trial and that the media identified her as one of the prosecutors who handled the case.  Am. Compl. ¶¶ 51, 86.

and (2) to advance public safety by encouraging authorities to focus their limited resources on prosecuting the correct culprits and avoid tainting prosecutions, which could need to be retried or even dismissed. *Id.* at 18. To further these goals, it offered several policy recommendations for reform at the DAO, including changes to office culture and discovery procedures. *Id.* at 27–33.

Consistent with these goals, the Report identified prosecutors who prosecuted the 52 cases involving misconduct. *Id.* at 9. The Report expressly stated its reasons for doing so: (1) to help the public assess whether the DAO and its prosecutors are "upholding [their] ethical and constitutional obligations," (2) to counter "the public perception that prosecutors are not held accountable for their actions" and the consequent erosion of "community trust in the [DAO's] work," and (3) to help the DAO identify policy solutions, including the potential to "audit or scrutinize cases handled by these prosecutors." *Id.* In so doing, the Report followed academic research recognizing the public benefits of identifying prosecutors found to have engaged in misconduct. *See id.* at 9 & n.54 (citing Adam M. Gershowitz, *Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct*, 42 U.C. DAVIS L. REV. 1059 (2009)).[7]

The body of the Report is 33 pages long; a 146-page Case Appendix follows it. McCaffery was not mentioned in the body of the Report; she was only mentioned in the approximately two-page discussion of *Patterson* in the Case Appendix. Ex. G at 73–75. The Case Appendix "republished the . . . claims of prosecutorial misconduct from [the Nol Pros] Motion" "in full," "extensively quot[ing]" the Nol Pros Motion verbatim. Am. Compl. ¶¶ 19, 253, 255. The Case

---

[7] While the Amended Complaint quotes extensively from Professor Gershowitz's article (Am. Compl. ¶¶ 239–240), the Report does not actually include any of these quotes and instead just cites the article in one footnote. Ex. G at 9 n.54. Professor Gershowitz's article has been cited approvingly in numerous academic publications and in judicial opinions. *See, e.g.*, *United States v. DeLeon*, 428 F. Supp. 3d 841, 1134 (D.N.M. 2019) (citing Gershowitz, 42 U.C. DAVIS L. REV. 1059), *aff'd sub nom. United States v. Herrera*, 51 F.4th 1226 (10th Cir. 2022).

Appendix accurately attributed the misconduct claims to the Nol Pros Motion:

> In the motion, ADA Voci noted that two different prosecutors failed to find and disclose th[e] favorable information . . . .  The motion also described Patterson's two trials as "egregious example[s] of police and prosecutorial misconduct," and it also noted that some of the information should have caught prosecutors' attention, because it was obviously favorable to the defense.  For instance, the Informant Memo [white paper] and related witness interviews did not mention Patterson as a suspect, and police created two different photo arrays that did not contain Patterson's photograph, which ostensibly should have raised questions for the prosecution.

Ex. G at 74 (quoting Ex. A at 2).  The Report continued, quoting the Nol Pros Motion:

> Separately, the motion criticized the prosecution's case as "illogical," given that Patterson returned to the crime scene, where witnesses saw him distraught and crying on the street immediately after the murder.  It also raised the possibility that, without suppressing the favorable information, "the prosecution could not win" the case against Patterson, and it noted that favorable information tends to be suppressed in "weak cases."  Finally, it criticized the prosecution for being unduly influenced by the "pressure to win" "serious cases," and observed that "[s]ome [prosecutors] feel the end justifies the means."

*Id.* at 74–75 (quoting Ex. A at 3); Am. Compl. ¶ 253.  In addition to the Nol Pros Motion, the Case Appendix's summary of *Patterson* cited additional sources, such as articles from *The New York Times* and *Philadelphia Inquirer*, the Pennsylvania Innocence Project's write-up of Patterson's case, and the National Registry of Exonerations.  Ex. G at 73 n.218; Am. Compl. ¶ 255.

The Case Appendix's summary of *Patterson* accurately identified McCaffery and Sax as the two prosecutors who tried the case in 2008 and 2009.  *See* Am. Compl. ¶¶ 51, 248; Ex. G at 73–74.  The summary also quoted four statements by Sax in a 2018 *Philadelphia Inquirer* article denying withholding information and maintaining "without any question" that "[e]verything" that was exculpatory was turned over to the defense.  Ex. G at 75 (quoting Ex. D at 5).  McCaffery was not quoted in the *Inquirer* article.  Ex. D at 4.

### E.    McCaffery Sues NYU and Cummings

McCaffery did not sue Voci (who signed and argued the Nol Pros Motion), the District

Attorney (on whose behalf Voci signed and argued the Motion), the DAO (who filed the Motion), the City of Philadelphia (which the DAO represents), or any of the "local, national, and even international" media outlets that republished the accusations in the Nol Pros Motion at the time. Am. Compl. ¶¶ 14, 56, 86, 89; *see*, *e.g.*, Exs. D–F; *see also* Ex. G at 73 n.218 (citing the referenced news articles). Instead, seven years after the fact, McCaffery brings this lawsuit against NYU and Cummings over the two pages in the Case Appendix of the 180-page Report that "extensively quote[d]" the DAO's Nol Pros Motion for its description of her involvement as one of two prosecutors on the case. Am. Compl. ¶ 253.

After litigating a Right-to-Know dispute against the DAO (to which Defendants were not parties) (*id.* ¶ 202), McCaffery initiated this lawsuit by Writ of Summons in the Court of Common Pleas of Bucks County on March 19, 2025 (Dkt. 1-2). McCaffery filed her original Complaint on May 8, 2025. Dkt. 1-5. On May 13, 2025, Defendants removed the action to this Court, invoking diversity jurisdiction. Dkt. 1 ¶¶ 7, 10–11. On June 27, 2025, Defendants moved to dismiss the original Complaint for failure to state a claim. Dkt. 21.

Rather than respond to Defendants' motion, McCaffery filed an Amended Complaint.[8] Dkt. 26. Like her original Complaint, the Amended Complaint asserts four counts against Defendants: (1) defamation, (2) false light, (3) intentional infliction of emotional distress, and (4) civil conspiracy.[9] Am. Compl. ¶¶ 336–377. Each claim is based on the theory that the Report

---

[8] The Amended Complaint was not accompanied by a redline as required by this Court's Policies & Procedures § 5 (and Plaintiff's counsel did not respond to Defendants' request for a redline). Further, the Amended Complaint's voluminous exhibits were generally not text-searchable and had no ECF descriptions, as required by the Policies & Procedures § 2. *See* Exs. 2–6. For the Court's convenience, Defendants have attached the relevant text-searchable exhibits as Exhibits A–G and a redline of the Amended Complaint as Exhibit H.

[9] The Amended Complaint also asserts a grab-bag of impertinent and irrelevant allegations about

falsely accused McCaffery of prosecutorial misconduct, namely, "hiding evidence" from Patterson as well as "pursing [sic] a murder prosecution on flimsy eyewitness testimony, making illogical arguments, [and] ignoring credible alibi testimony" in a case against an innocent man. *Id.* ¶¶ 338–339, 357, 366, 368. McCaffery's pleading has ballooned to 377 paragraphs over 58 pages, with roughly 2,000 pages of trial transcripts in six exhibits. None of that alters the bottom line: Defendants published a fair report of the Nol Pros Motion and other public proceedings in the *Patterson* case. Defendants now renew their Motion to Dismiss.

## III. ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a Rule 12(b)(6) motion, the Court must "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). Additionally, "the Court need not accept as true allegations that are directly contradicted by indisputably authentic documents on which the complaint relies, or matters of public record." *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017).

---

NYU and Cummings. For example, it alleges that NYU violated a criminal statute, Pennsylvania's Criminal History Record Information Act ("CHRIA"), 18 Pa. Cons. Stat. § 9101 *et seq.*, by accessing the DAO's criminal investigative materials (Am. Compl. ¶¶ 152, 155), even though McCaffery does not (and could not) bring a claim under CHRIA. In any event, the Case Appendix's summary of *Patterson* makes clear that its cited sources were publicly available filings and media reports—*not* DAO investigative materials. *See* Ex. G at 73 n.218.

The Amended Complaint makes additional sweeping averments concerning *other* matters—wholly unrelated to *Patterson*—in which Cummings purportedly was involved, which McCaffery contends demonstrate Cummings' "reputation for dishonesty." Am. Compl. ¶ 166; *see also, e.g., id.* ¶¶ 156–178. Because those allegations have no bearing on the fair-report privilege barring McCaffery's claims, this Motion need not and does not address them. *See infra* Parts III.B–D. In any event, the Report transparently discloses and discusses some of these issues, including those raised by Judge Mitchell Goldberg. *See* Ex. G at 118–19.

At bottom, the "factual allegations are scrutinized to determine if the allegations and inferences proposed from those allegations are plausible." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 502 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021).

In deciding whether a defamation claim is actionable, courts must "be guided by America's profound 'commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Parks Miller v. Centre County*, 2016 WL 2752645, at *7 (M.D. Pa. May 11, 2016) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)), *aff'd*, 702 F. App'x 69 (3d Cir. 2017). Both Pennsylvania and New York courts instruct that early adjudication of defamation suits, especially those brought by public officials like McCaffery, is "essential" to "avoid[] . . . long and expensive litigation productive of nothing" and "curb[] the danger that the threat of such litigation will be used to harass or to coerce a settlement," at the cost of "free debate." *First Lehigh Bank v. Cowen*, 700 A.2d 498, 502 (Pa. Super. 1997) (citation omitted); *see Catalanello v. Kramer*, 18 F. Supp. 3d 504, 510–11 (S.D.N.Y. 2014) (applying fair-report privilege on dismissal motion and observing "there is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms").[10]

Here, the Amended Complaint fails to state a cause of action and must be dismissed with prejudice because both the New York and Pennsylvania fair-report privileges bar McCaffery's

---

[10] *See also Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 563 (N.Y. 1980) ("[T]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself."); *Immuno A.G. v. Moor-Jankowski*, 537 N.Y.S.2d 129, 137 (App. Div. 1989) ("To unnecessarily delay the disposition of a libel action is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights."), *aff'd*, 549 N.E.2d 129 (N.Y. 1989), *vacated on other grounds*, 497 U.S. 1021 (1990).

claims. *See Lee v. TMZ Prods. Inc.*, 710 F. App'x 551, 561 n.11 (3d Cir. 2017) ("[Where] the articles are immunized from any defamation claims based on the fair-report privilege, amendment would be futile, and dismissal with prejudice was warranted.").

As Judge Arlin Adams explained, the privilege is supported by three rationales. *See Medico v. Time, Inc.*, 643 F.2d 134, 140–42 (3d Cir. 1981). Under the "agency theory," "one who reports what happens in a public, official proceeding acts as an agent for persons who had a right to attend, and informs them of what they might have seen for themselves." *Id.* at 140–41. Under the "public supervision" theory, the privilege ensures "security which publicity gives for the proper administration of justice." *Id.* at 141 (quoting *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884)). Quoting Justice Holmes, Judge Adams explained, "the trial of causes should take place under the public eye . . . because it is of the highest moment that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Id.* (quoting *Cowley*, 137 Mass. at 394). And under the third, most fundamental rationale, the fair-report privilege advances "the public's interest in learning of important matters." *Id.* at 142. In sum, the privilege protects the indispensable democratic function of the press and legal academy in keeping the public informed of government proceedings.

As demonstrated below, Pennsylvania's choice-of-law rules compel that New York's absolute privilege applies here, and the privilege mandates dismissal of the Amended Complaint. Alternatively, the claims fail as a matter of law under Pennsylvania's qualified privilege. Last, Defendants are entitled to attorneys' fees under Pennsylvania's anti-SLAPP law.

### A.    New York Law Applies to Defendants' Fair-Report Privilege

Under choice-of-law principles, New York's statutory privilege for fair reports of judicial proceedings, N.Y. Civ. Rights Law § 74, applies to the Report concededly published in New York.

That is so even if McCaffery's underlying defamation claims are governed by Pennsylvania law: Under Pennsylvania's choice-of-law rules, different states' laws may apply to the underlying claim and to a privilege defeating liability.

### 1.    Pennsylvania Choice-of-Law Principles

In diversity actions like this one, the Court begins by applying "the choice of law rules of the state of Pennsylvania," the forum state. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (Alito, J.). Under these rules, the Court must first assess whether a "true conflict" exists between the two interested states' laws—that is, whether the laws are materially different and produce different chances of success or failure. *Id.* Here, a true conflict exists between the fair-report privileges of New York and Pennsylvania. New York's "privilege is absolute and is not defeated by allegations of malice or bad faith." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (citation omitted). By contrast, Pennsylvania has "a qualified or conditional privilege, rather than absolute," that can be overcome if the account of the underlying proceeding is "published solely for the purpose of causing harm to the person defamed." *Monge v. Univ. of Pa.*, 2023 WL 3571935, at *5 (E.D. Pa. May 19, 2023) (citation omitted). Because a true conflict exists, the Court "must engage in choice of law analysis" as between New York's and Pennsylvania's fair-report privileges. *Berg*, 435 F.3d at 463; *see, e.g.*, *Kinsey*, 991 F.3d at 176 (recognizing true conflict between absolute and qualified privileges).

To be clear, this Motion asks the Court to determine which state's law governs the fair-report privilege—not McCaffery's underlying defamation claim. The principle of "dépeçage" in Pennsylvania choice-of-law doctrine makes those two inquiries different. *Berg*, 435 F.3d at 462 ("Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'dépeçage.'"). Pennsylvania courts "have long recognized that they are not bound to decide all issues under the local law of a single state." *Knipe*

14

*v. SmithKline Beecham*, 583 F. Supp. 2d 602, 637 (E.D. Pa. 2008) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. d).[11]  Thus, "Pennsylvania follows a 'flexible rule,' that 'permits analysis of the policies and interests underlying the *particular issue* before the court.'"  *Berg*, 435 F.3d at 463 (emphasis added) (quoting *Griffith*, 203 A.2d at 805).

Under Pennsylvania rules, "whether a person is excused from liability by reason of the fact that his action was . . . privileged by the local law of the state where he acted" (such as the fair-report privilege) is determined by the application of various factors.  RESTATEMENT § 163.  The Court must assess which state, "*with respect to that issue*, has the most significant relationship to the occurrence and the parties," *id.* § 145(1) (emphasis added), in light of the following factors:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2).  Additionally, in tort cases specifically, the Court considers:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2).  At bottom, the Court must identify which state "has the most significant relationship with the 'policies and interests underlying the particular issue.'"  *Orawsky v. Jersey Cent. Power & Light Co.*, 472 F. Supp. 881, 883 (E.D. Pa. 1977) (quoting *Griffith*, 203 A.2d at 805).

Based on these principles, New York has the most significant relationship with a New York–based publisher's and author's fair-report privilege.  This holds true even if the forum state's

---

[11] Pennsylvania courts have adopted the *Restatement (Second) of Conflict of Laws* as a "starting point" in their choice-of-law analysis.  *Berg*, 435 F.3d at 463 (citing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964)).

law governs the underlying defamation claim.  *See*, *e.g.*, *Wilkow v. Forbes, Inc.*, 2000 WL 631344, at *7 (N.D. Ill. May 15, 2000) (applying New York's fair-report privilege and Illinois law to plaintiff's defamation claim), *aff'd*, 241 F.3d 552 (7th Cir. 2001); *Goguen v. NYP Holdings, Inc.*, 544 P.3d 868, 879, 883 (Mont. 2024) (undertaking choice-of-law analysis of "the fair report privilege independently of the underlying defamation claim" and concluding that New York's privilege applies to Montana defamation claim).

### 2.     The Choice-of-Law Factors Weigh Heavily in Favor of Applying New York's Fair-Report Privilege

The Restatement factors decisively point to New York's privilege.  The *first factor*—"the needs of the interstate and international systems"—dictates "the application of a state's law with the most significant relationship to the issue."  *Goguen*, 544 P.3d at 880.  As explained below, that state is New York given "New York's significant policy interests" in its fair-report privilege.  *Id.*

The *second* and *third factors*, "the relevant policies and interests of the forum state and other interested states," also favor New York.  These policies and interests concern the intended purpose of the "the fair report privilege and *not* the underlying defamation claim."  *Id.* (emphasis added).  The fair-report privilege "is meant to protect speakers, not provide a remedy to plaintiffs." *Id.* at 881 (quoting *Wilkow*, 2000 WL 631344, at *7).  New York's absolute privilege, codified by statute, affords "broad protection" for reporting on judicial proceedings without fear of liability. *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002). "New York's interest in fixing the scope of a privilege applicable to conduct taking place within its borders is paramount," but it would be "wholly eviscerated" if the conduct of the speaker were "evaluated under another state's privilege laws."  *Goguen*, 544 P.3d at 881 (quoting *Wilkow*, 2000 WL 631344, at *7).  Thus, "New York has a stronger interest in the determination of the privilege issue . . . because the privilege protects the speaker," the speech emanated from New York, and

16

New York's privilege provides more protection than Pennsylvania's privilege.  *Id.*

The *fourth factor*—the "protection of justified expectations"—favors application of New York's privilege too.  Defendants, "as . . . holder[s] of the privilege, had a justifiable expectation that New York law would be applied uniformly to [their] conduct," because they published the Report in New York.  *Id.*  It would be "unfair and improper" to hold them liable under Pennsylvania law when they had "justifiably molded [their] conduct to conform to the requirements of" New York's fair-report privilege.  RESTATEMENT § 6 cmt. g.

The next relevant factor is the *sixth factor*—"certainty, predictability, and uniformity of results"—which also favors applying New York's privilege.  Where, as here, the alleged "tortious conduct occurred in one state and the injury occurs nationwide," applying New York's privilege "consistently" to conduct in New York "results in certainty and predictability for publishers." *Goguen*, 544 P.3d at 882.  This is particularly so because numerous courts have affirmed that New York publishers can rely on New York's fair-report privilege even when reporting on people in other states.  *See id.* at 883 (Montana resident); *Wilkow*, 2000 WL 631344, at *6–7 (Illinois resident); *see also*, *e.g.*, *Kinsey*, 991 F.3d at 178 (Maryland resident working in D.C.); *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 167–69 (S.D.N.Y. 2021) (Florida resident); *Miller v. Gizmodo Media Grp., LLC*, 2019 WL 1790248, at *6 (S.D. Fla. Apr. 24, 2019) (Virginia resident).

The additional choice-of-law considerations for tort claims further favor New York.  The place of "the conduct [allegedly] causing the injury" is New York.  NYU is located in New York and published the allegedly defamatory statements (*i.e.*, the Report) there.  Am. Compl. ¶¶ 34–35, 226, 363.  And Cummings was an employee of NYU, where she allegedly participated in publishing the Report.  *Id.* ¶¶ 17, 147, 345 (alleging that Cummings published the Report while "employed by NYU" and "was at all material times acting within the course and scope of her

17

employment and/or agency with NYU"). Thus, "the alleged defamatory statement emanated from New York." *Kinsey*, 991 F.3d at 178. McCaffery concedes that the relevant conduct allegedly causing her injury was the publication of the Report. *See* Am. Compl. ¶¶ 353, 364, 366, 368, 375 (alleging that McCaffery suffered injury as a result of "the delivery and publication of the Defamatory Statements," "casting [her] in a false light," and "disseminating lies about [her]"). And it is beyond dispute that the publishing conduct occurred in New York.[12] "[T]he place where the conduct occurred is given particular weight" here, because "the conduct was . . . privileged by the local law of the state where it took place." RESTATEMENT § 145 cmt. e.

Conversely, the "place of injury will *not* play an important role" in the case of "multistate defamation, [where] injury has occurred in two or more states." *Id.* (emphasis added). While McCaffery is domiciled and allegedly injured in Pennsylvania, because the Report was "a national publication, the injury is not confined to [Pennsylvania] alone as [McCaffery's] reputation purportedly suffered nationwide." *Goguen*, 544 P.3d at 882. Indeed, the Amended Complaint alleges that the Report was "widely circulated" online both "nationally and internationally." Am. Compl. ¶¶ 30, 323, 363. Thus, the place of injury is less important.

Last, with respect to "the domicile or place of business of the parties," McCaffery resides in Pennsylvania, NYU is in New York, and Cummings was employed by NYU. *Id.* ¶¶ 17, 32, 34–35, 147, 345. "Here, because the privilege protects the speaker, the conduct occurred in New York, and the speaker . . . is located in New York, this factor weighs in favor of New York's privilege

---

[12] While McCaffery alleges that Defendants "research[ed]" the Report in Pennsylvania and obtained information from the DAO, that allegation has no bearing on the choice-of-law analysis. Am. Compl. ¶ 39. McCaffery was not injured and defamed by "research"; rather, the publication of the Report in New York allegedly caused her injury. Thus, "Defendants' most significant conduct—publishing the allegedly defamatory [Report]—took place in New York." *Miller*, 2019 WL 1790248, at *3, *5 (holding that publication in New York caused injury, notwithstanding that defendants "conspired" with Florida resident to obtain confidential court documents).

law." *Goguen*, 544 P.3d at 883.  Further, because Cummings worked for and allegedly published the Report at NYU (Am. Compl. ¶ 17), New York's strong interest under this factor is not diminished even if she worked for NYU while allegedly living out of state.  *See Kesner*, 515 F. Supp. 3d at 169 (finding that employee of New York publisher was located in New York for choice-of-law purposes, notwithstanding employee's domicile in New Jersey).

In sum, "every factor . . . of consequence points towards New York and its law having the most significant relationship to the issue of the fair report privilege."[13]  *Goguen*, 544 P.3d at 882. Thus, New York law governs the privilege.  *Id.* at 883; *Wilkow*, 2000 WL 631344, at *7.

### B.    The Amended Complaint Must Be Dismissed Because the Report Is Protected Under New York's Fair-Report Privilege

McCaffery's defamation and related claims are barred by New York's fair-report privilege. New York Civil Rights Law § 74 provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding."  N.Y. Civ. Rights Law § 74.  Courts are directed to "adopt a liberal interpretation of the fair and true report standard of [section] 74" to provide "broad protection" to accounts of judicial proceedings. *Kinsey*, 991 F.3d at 179 (quoting *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017)). Courts determine whether the privilege applies "'as a matter of law' on a motion to dismiss," and routinely grant such motions.  *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 312 (S.D.N.Y. 2019) (quoting *ABKCO Music, Inc. v. Sagan*, 2016 WL 2642224, at *4 (S.D.N.Y. May 6, 2016)).[14]

---

[13] The remaining factors are inapplicable or relatively unimportant.  *Goguen*, 544 P.3d at 882–83.

[14] *See, e.g.*, *Kinsey v. N.Y. Times Co.*, 2020 WL 1435141, at *7–8 (S.D.N.Y. Mar. 23, 2020), *aff'd*, 991 F.3d 171 (2d Cir. 2021); *Friedman v. Bloomberg L.P.*, 180 F. Supp. 3d 137, 152 (D. Conn. 2016) (applying N.Y. law), *aff'd in relevant part*, 884 F.3d 83, 94 (2d Cir. 2017); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022); *Cummings v. City of New York*, 2020 WL 882335, at *19 (S.D.N.Y. Feb. 24, 2020).

### 1.    The Report Is a Substantially Accurate Description of the Proceedings

The crux of the privilege is whether an account is a fair and true report of a proceeding. To make this determination, courts compare the text of the challenged publication with the underlying court records.[15]    The privilege "applies to 'any person,' not just to journalists." *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 221 (E.D.N.Y. 2012); *see also Branca v. Mayesh*, 476 N.Y.S.2d 187, 188 (App. Div. 1984) (privilege applied to bar association lecture given by attorney who prosecuted and lost underlying action), *aff'd*, 473 N.E.2d 261 (N.Y. 1984).

There are four fundamental principles underlying New York's fair-report privilege.

*First*, the privilege protects reporting on the charges and allegations that typify judicial proceedings.  *Cummings*, 2020 WL 882335, at *16.  Thus, where a report accurately recounts the allegations made in court filings, the privilege applies "regardless of whether the underlying allegations are in fact true."  *Id.*; *see also Mulder v. Donaldson, Lufkin & Jenrette*, 611 N.Y.S.2d 1019, 1023 (Sup. Ct. 1994) ("The question is not whether or not the statement is 'true.' The question is whether it is a substantially accurate description of the claims made in the . . . proceeding."), *aff'd*, 623 N.Y.S.2d 560 (App. Div. 1995).

*Second*, for the privilege to apply, the substance of the report need only be "substantially accurate."  *Cummings*, 2020 WL 882335, at *16 (quoting *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979)).  The report's language "should not be dissected and analyzed with a lexicographer's precision."  *Id.* (quoting *Holy Spirit*, 399 N.E.2d at 1187).  Rather, a report is substantially accurate so long as, "despite minor inaccuracies, [it] does not produce a different effect on a reader" than would a report containing

---

[15] *See*, *e.g.*, *Zappin v. Daily News, L.P.*, 2017 WL 3425765, at *6 & n.9 (S.D.N.Y. Aug. 9, 2017); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 478 (S.D.N.Y. 2012); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 414–15 & n.52 (S.D.N.Y. 2009).

the precise allegation made in the proceeding. *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 329–30 (S.D.N.Y. 2021) (citation omitted), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. Apr. 5, 2022).

*Third*, the privilege does not require a report to be exhaustive or balanced. Even where a report omits facts favorable to the plaintiff, the privilege still attaches where "those omissions d[o] not alter the substantially accurate character of the article." *Rakofsky v. Wash. Post*, 971 N.Y.S.2d 74, at *9 (Sup. Ct. 2013) (quoting *McDonald v. E. Hampton Star*, 781 N.Y.S.2d 694, 695 (App. Div. 2004)); *see also Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (App. Div. 2009) ("[T]here [i]s no requirement that the publication report the plaintiff's side of the controversy.").

*Fourth*, the "privilege is absolute and is not defeated by allegations [that the report was published with] malice or bad faith." *Kinsey*, 991 F.3d at 176 (quoting *Fuji Photo*, 669 F. Supp. 2d at 411). In other words, a defendant's alleged state of mind in writing and publishing the report is "irrelevant." *Wilkow*, 2000 WL 631344, at *4 (applying New York law).

Under these principles, the Report falls squarely within the ambit of the privilege. As the Amended Complaint concedes, the Report "republished" the same allegations of misconduct made in the Nol Pros Motion, "extensively quot[ing]" them verbatim. Am. Compl. ¶¶ 19, 24, 253, 255, 257. And the Report clearly attributed these allegations to the Nol Pros Motion, repeatedly referencing and citing the Motion. Ex. G at 73–75 & nn.218–226; Am. Compl. ¶¶ 253–255.[16]

---

[16] That McCaffery is not expressly mentioned by name in the Nol Pros Motion but is named in the Report is of no moment. The Nol Pros Motion stated that "both trial prosecutors" failed to disclose the exculpatory information (Ex. A at 2–3), and McCaffery was one of the two lead attorneys of record for the Commonwealth at the trials (Ex. C at 2). *See* Am. Compl. ¶ 63 (acknowledging that the Nol Pros Motion itself "implicated" McCaffery). The Report accurately combined these two pieces of publicly available information from court records. *Id.* ¶ 250; *see Hanft v. Heller*, 316 N.Y.S.2d 255, 258 (Sup. Ct. 1970) ("The addition of the name of the plaintiff to the summary . . . does not vitiate the privilege enjoyed by the defendant . . . for it is obviously a part of the judicial

In an effort to avoid the privilege, the Amended Complaint strains to find "additional" facts in the Report that supposedly were not contained within the Nol Pros Motion, allegedly rendering the Report inaccurate. *E.g.*, Am. Compl. ¶¶ 302, 308. These allegations fail, for two reasons.

**1.** The Report's so-called "additional facts" do not at all "suggest[] conduct more serious than the conduct alleged in the underlying [Nol Pros Motion]." *Ctr. for Med. Progress*, 551 F. Supp. 3d at 330–31 (report is "substantially accurate" where it does not "produce a different effect on a reader" than the underlying allegation). The Nol Pros Motion leveled serious charges. It accused the trial prosecutors of "egregious . . . prosecutorial misconduct" for "hiding evidence helpful to the defense." Ex. A at 2. It called their case "weak" and "illogical." *Id.* at 3. It accused them of abdicating their responsibility "to review the police homicide file and ask questions." *Id.* And it concluded that the target of their prosecution was "probably innocent." *Id.* at 1. Importantly, these serious allegations—all found in the Nol Pros Motion and quoted nearly verbatim in the Report (Ex. G at 74)—make up the crux of each of McCaffery's claims. *See* Am. Compl. ¶¶ 338–339, 357, 366, 368 (asserting claims for being falsely accused of "hiding evidence" as well as "pursing [sic] a murder prosecution on flimsy eyewitness testimony, making illogical arguments, [and] ignoring credible alibi testimony" in order to "prosecute an innocent man").

The purported "additional facts" in the Report pale in comparison to these key allegations drawn directly from the Nol Pros Motion. The additional facts simply provide background about the trial, such as that the eyewitnesses "only briefly saw the shooter" or that McCaffery argued Patterson "changed clothes" before returning to the scene. *Id.* ¶¶ 261, 301–302. Even assuming these facts are not drawn from the proceedings (and they are, as detailed below), they do not

---

record."); *SentosaCare LLC v. Lehman*, 95 N.Y.S.3d 126, at *7 (Sup. Ct. 2018) ("There is no requirement that a [privileged report] be limited to a single source or a single proceeding.").

suggest conduct more serious than the grave misconduct alleged in the Nol Pros Motion.  Instead, these additional facts are merely "background to the misconduct attributed to [McCaffery in the Nol Pros Motion] rather than a separate and independently defamatory accusation."  *Ctr. for Med. Progress*, 551 F. Supp. 3d at 330–31 (quoting *Ford v. Levinson*, 454 N.Y.S.2d 846, 848 (App. Div. 1982)).  Such background facts "come within the statutory privilege."  *Id.*; *see also El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F. Supp. 1038, 1043 (E.D.N.Y. 1985) (finding that "further allegations not contained in the court papers" "added" for "background" "do not remove the article from the protection of Section 74"), *aff'd*, 806 F.2d 392 (2d Cir. 1986).[17]

    2.    Each of the Report's purported additional facts are in fact drawn from the *Patterson* proceedings, and they can be found in the Nol Pros Motion, the nol-pros hearing transcript, or the trial transcript.  Therefore, the Report's account of the proceedings is substantially accurate, and it is not defeated by the "lexicographic dissection" of supposed "minor inaccuracies" urged by McCaffery.  *Ctr. for Med. Progress*, 551 F. Supp. 3d at 329, 331; *see also Tacopina v. O'Keeffe*, 645 F. App'x 7, 9 (2d Cir. 2016) ("Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition.").  For example, the Amended Complaint cites the following allegedly false statements in the Report, but they are in fact supported by the Nol Pros Motion and the transcripts[18]:

- *The white paper "did not mention Patterson as a suspect."  Am. Compl. ¶ 278.*  The white paper was attached to the Nol Pros Motion and, as a matter of fact, did not mention Patterson

---

[17] Indeed, the Amended Complaint concedes that, to the extent the Report goes beyond the Nol Pros Motion, it does so to provide background to the misconduct.  *See* Am. Compl. ¶ 275 (facts added to help "the reader to understand and assess the violation").

[18] That the Report did not cite the transcripts in a footnote is of no moment.  Defendants were entitled to "rel[y] on secondary sources that report on judicial proceedings" (such as the cited National Registry of Exonerations and other public sources) in their own report on the proceedings.  *Bauer v. Baud*, 2023 WL 2307413, at *7 (S.D.N.Y. Mar. 1, 2023); *see also Cholowsky*, 887 N.Y.S.2d at 596 (fair-report privilege protects reliance on "secondary sources" provided that defendants' story is a substantially accurate portrayal of the proceedings).

as a suspect. Rather, it stated that the suspect "offender is allegedly a Black male known as [REDACTED]," and a *different* "Black male known as Donte [Patterson] was present during the shooting." Ex. A at 17. And at the nol-pros hearing, ADA Voci expressly stated that the white paper "identified another person as the killer, *not* Donte Patterson." Ex. B at 7:7–9 (emphasis added).

- *"The prosecution did not offer a motive for why Patterson wanted to kill his friend, or why he would have chosen to return to the scene when he could have stayed home." Am. Compl. ¶ 303.* The Nol Pros Motion faulted the prosecution for this very reason, writing that the "prosecution's theory" and the "case" were "illogical" because "Patterson had no motive to kill" his "friend," and because Patterson was at the scene even though "[k]illers do not usually remain or return to the scene." Ex. A at 3.

- *"[O]n cross-examination [the witnesses] admitted that Patterson was wearing different clothing than the shooter." Am. Compl. ¶ 291.* The Nol Pros Motion stated that the two eyewitnesses "oddly claimed that Patterson . . . was wearing different clothing than at the time of the shooting" (Ex. A at 3, 8), and the trial transcript confirms this admission on cross-examination (Ex. C at Aug. 6, 2008 Trial Tr. at 55:14–56:23 (Laventure cross), Aug. 11, 2008 Trial Tr. at 47:13–48:14 (Brunache cross)). McCaffery grossly mischaracterizes this statement in the Report as saying that the witnesses "recanted" their identification (Am. Compl. ¶ 294), but the Report said no such thing. To the contrary, the Report explained that the two witnesses to the shooting identified Patterson as the shooter, and then also saw Patterson at the scene wearing different clothing after he supposedly "changed clothes." Ex. G at 73.

- *The DAO's investigation "discovered that homicide prosecutors did not disclose favorable impeachment information relating to a key prosecution witness." Am. Compl. ¶ 313.* Again, McCaffery grossly mischaracterizes the Report as implying that McCaffery (and not only Sax) failed to disclose impeachment information relating to Officer Chandler before the first trial. But the Report expressly states that "McCaffery had *not* used [Chandler] as a witness," and the "impeachment information . . . was not disclosed prior to the *second* trial" that Sax handled. Ex. G at 74 (emphases added). Thus, the Report actually provides *more* clarity about which prosecutor failed to disclose this information than the Nol Pros Motion, which did not specify when the failure occurred. Ex. A at 11.[19]

Other allegedly false statements in the Report are directly supported by the trial transcript.

While McCaffery points to other testimony to lend support to her (unsuccessful) prosecution, Defendants were not obligated to include her preferred excerpts. "Defendants are protected if there was testimony at the trial which substantially supported their report of the proceeding, regardless

---

[19] The Report's statement that "homicide prosecutors" (plural) failed to disclose impeachment evidence derives from the fact that the evidence originated from a separate DAO prosecution for arson murder, which both that team and Sax had access to but failed to disclose. Ex. A at 10–11.

of whether the testimony was true." *Keogh v. N.Y. Herald Trib., Inc.*, 274 N.Y.S.2d 302, 308 (Sup.

Ct. 1966), *aff'd*, 285 N.Y.S.2d 262 (App. Div. 1967). Defendants' "choice of material to go into

[the Report], and the decision to omit certain details . . . are not actionable." *Sassower v. N.Y.

Times Co.*, 852 N.Y.S.2d 180, 181–82 (App. Div. 2008) (quoting *Miami Herald Pub. Co. v.

Tornillo*, 418 U.S. 241, 258 (1974)); *see also Saleh v. N.Y. Post*, 915 N.Y.S.2d 571, 575 (App.

Div. 2010) ("[T]he fact that the article omitted certain information that was contained in the . . .

action did not alter the substantially accurate character of the article."). For example:

- The witnesses "*only briefly saw the shooter." Am. Compl. ¶ 261.* This statement accurately reports the trial testimony of the two eyewitnesses, who both testified that they saw the shooter for only "two seconds" or "a few seconds." Ex. C. at Aug. 6, 2008 Trial Tr. at 82:3–13 (Laventure redirect), Aug. 11, 2008 Trial Tr. at 22:3–16 (Brunache direct).

- *"Patterson's sister testified that they were home together, and she saw him sleeping in bed before she went to the bathroom." Am. Compl. ¶ 296.* Patterson's sister so testified at the trial. Ex. C at Aug. 11, 2008 Trial Tr. at 96:22–102:7 (Kareema direct: "Q. Now, directing your attention to specifically around [the time of the shooting], where was your brother, Dontia, in the house? A. In his room sleeping. . . . In his room, in his bed.").

- *"[McCaffery] argued that Patterson shot Jackson and fled back to his house, where he changed clothes and then returned to the scene." Am. Compl. ¶ 301.* McCaffery made this very claim during her opening statement at the trial. Ex. C at Aug. 5, 2008 Trial Tr. at 163:8–16 (McCaffery opening: "You'll hear [Laventure's] 911 call. And he says: I just saw the shooting. . . . The guy who did the shooting had a black hoodie on. He ran down the alleyway. He's back here. He came right back to the scene, he changed his clothes, standing out here acting like he's innocent.").[20]

Finally, while McCaffery argues that the Report was not "neutral" because it did not

include her preferred testimony excerpts (Am. Compl. ¶ 257), "there was no requirement that the

publication report the plaintiff's side of the controversy." *Cholowsky*, 887 N.Y.S.2d at 596. And

in fact, the Report was balanced by contrary views provided by Sax, whom the Report quoted *four*

---

[20] While McCaffery's opening did not specifically say where Patterson ultimately fled, whether he fled to change clothes at his house or another location down the alley "does not produce a different effect on a reader" nor defeat the Report's substantially accurate description of the proceedings. *Ctr. for Med. Progress*, 551 F. Supp. 3d at 329.

times.  Ex. G at 75; *see L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 (2d Cir. 1988) (fair report where publication was "balanced" by other interviews challenging the narrative).

In sum, the privilege fully protects Defendants.  And it does so regardless of the Amended Complaint's inflammatory allegations of bad faith by Cummings or NYU in writing the Report, *e.g.*, NYU's purported knowledge that judges had criticized Cummings for (baseless) ethical violations in other cases, or the (baseless) suggestion that NYU illegally accessed DAO files in violation of CHRIA.  *See*, *e.g.*, Am. Compl. ¶¶ 152–178.  Such allegations do not bear—at all— on the New York privilege.  *See Kinsey*, 991 F.3d at 176 ("[The] privilege is absolute and is not defeated by allegations of malice or bad faith.").

### 2.    Defendants Did Not Institute a Proceeding for the Sole Purpose of Later Defaming McCaffery

New York's fair-report privilege has only one judicially created exception, often referred to as the "sham action" exception, and it does not apply here.  The exception applies only to persons who "maliciously institute a judicial proceeding alleging false and defamatory charges, and . . . then circulate a press release or other communication based thereon."  *Williams v. Williams*, 246 N.E.2d 333, 337 (N.Y. 1969).  "New York courts have consistently held that the *Williams* exception is a narrow one."  *D'Annunzio*, 876 F. Supp. 2d at 218 (quoting *Riel v. Morgan Stanley*, 2007 WL 541955, at *12 (S.D.N.Y. Feb. 16, 2007), *aff'd*, 299 F. App'x 91 (2d Cir. 2008)).  The exception applies only if the plaintiff plausibly alleges "that the [underlying proceeding] was brought maliciously and *solely* for the purpose of later defaming the plaintiff."  *Branca*, 476 N.Y.S.2d at 189 (emphasis added).

The Amended Complaint fails to plausibly allege any facts sufficient to trigger the narrow *Williams* exception.  The Amended Complaint does not and cannot allege that Defendants initiated

the *Patterson* proceeding maliciously and *solely* for the purpose of later defaming McCaffery. This is so for several reasons.

    **1.**  It is clear that *Defendants* did not "institute a judicial proceeding." *Williams*, 246 N.E.2d at 337.  Rather, the *Patterson* prosecution was instituted—*i.e.*, charged—by the DAO (which was then represented by McCaffery).  Am. Compl. ¶ 51.  Years later, the DAO, represented by Voci (*not* Cummings or NYU), filed and argued the Nol Pros Motion. *Id.* ¶ 55; Ex. A at 11.  Thus, even assuming *arguendo* that Cummings drafted the Nol Pros Motion (Am. Compl. ¶ 56), someone else filing and arguing a motion in an already-initiated proceeding cannot trigger the *Williams* exception. *See Riel*, 2007 WL 541955, at *12 (*Williams* exception does not apply where "defendants submitted perjurious declarations in" but "did not bring the . . . action").

    **2.**  McCaffery does not (and cannot) plausibly allege that Cummings wrote the Nol Pros Motion in 2018 "solely for the purpose of later defaming" McCaffery six years after the fact in the 2024 NYU Report. *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, 2009 WL 4547792, at *17 (E.D.N.Y. Dec. 1, 2009).  Cummings allegedly did not even begin working for NYU until 2020—*two years* after the Nol Pros Motion was filed.  Am. Compl. ¶ 147.  The sole purpose of the Nol Pros Motion could not possibly have been to defame McCaffery in a Report that was not conceived and published until years later by a then-unrelated university.

    **3.**  The Amended Complaint concedes that the Nol Pros Motion was not intended to defame McCaffery—let alone solely intended to defame her.  Instead, it alleges that the primary purpose of the Nol Pros Motion was to accuse *Sax*—not McCaffery—of misconduct.  Am. Compl. ¶¶ 53–54, 59–60.  Specifically, the Amended Complaint alleges that "to go after Sax" in the Nol Pros Motion, Cummings "would also have to attack" McCaffery, since they both handled the case. *Id.* ¶ 54.  But the Amended Complaint concedes that Cummings had "no personal or professional

history with" McCaffery, confirming that the accusations were not directed at defaming her.  *Id.*

**4.**  The text of the Nol Pros Motion—and the fact that a court granted it—make clear that its sole purpose was not to later defame McCaffery.  In the Nol Pros Motion, the DAO explained that it filed the Motion because the DAO declined to proceed with the impending third trial and needed "to prevent wrongful convictions" of the innocent.  Ex. A at 1, 6.  These purposes—to decline a retrial and avoid wrongful convictions—are wholly separate from any allegations of misconduct against McCaffery.  And critically, these purposes were found to be proper by a court, which *granted* the Nol Pros Motion.  Ex. B at 11:24–12:9; *see Wexler*, 374 F. Supp. 3d at 312 n.8 (holding that claimant failed to allege that pleading was filed for "sole purpose" to defame where the court had issued ruling "upholding" some of the pleading's claims);[21] *see also Com. v. Reinhart*, 353 A.2d 848, 853 & n.12 (Pa. 1976) (court may deny motion if "the reason given by the Commonwealth for requesting the nolle prosequi" is not "valid and reasonable").

**5.**  McCaffery baselessly alleges that the Nol Pros Motion was "unnecessary" to accomplish its purpose to dismiss the charges.  Am. Compl. ¶¶ 66, 208.  Not so:  A *nolle prosequi* can only be entered "[u]pon motion of the attorney for the Commonwealth," Pa. R. Crim. P. 585(A), and requires "the approval of the court," 42 Pa. Cons. Stat. § 8932.  While the motion can be oral rather than written, it must still provide a "valid and reasonable" reason.  *Reinhart*, 353 A.2d at 853.  That the DAO decided to articulate its reasons in the written Nol Pros Motion, in addition to oral argument, does not suggest that the sole reason was to later defame McCaffery.

In sum, the sole exception to section 74 for "sham actions" is inapplicable, and the Report

---

[21] Highlighting just how narrow the sham-action exception is, even where the underlying suit is dismissed, courts *still* do not find the suit to be a sham where it was litigated extensively, *Haynes v. Bonner*, 130 N.Y.S.3d 899, at *5–6 (Sup. Ct. 2020), or did not garner sanctions for frivolous conduct, *Frydman v. Verchleiser*, 172 F. Supp. 3d 653, 673 (S.D.N.Y. 2016).

is absolutely privileged.  The Amended Complaint should be dismissed with prejudice.

### C.    Alternatively, the Amended Complaint Must Be Dismissed Because the Report Is Protected Under Pennsylvania's Fair-Report Privilege

Even if this Court applies Pennsylvania's fair-report privilege rather than New York's, McCaffery's defamation and related claims still fail.  "Pennsylvania has long recognized a privilege for the press to publish accounts of official proceedings or reports even when they contain defamatory statements."  *Friedman v. Isr. Labour Party*, 957 F. Supp. 701, 709 (E.D. Pa. 1997). The privilege protects fair reports of proceedings "even though information contained therein is false or inaccurate."  *Id.*  The privilege protects not only the press, but also other persons or entities who "disseminate information to the public."  *Wilson v. Slatalla*, 970 F. Supp. 405, 418 n.3 (E.D. Pa. 1997).  As with the New York privilege, courts regularly grant motions to dismiss under Pennsylvania's fair-report privilege, which can be decided "as a matter of law."  *Murray v. Shaw*, 2025 WL 915752, at *10 (D.D.C. Mar. 26, 2025) (applying Pennsylvania law).[22]

Pennsylvania's fair-report privilege is "qualified" and applies where, as here, defendants meet two conditions.  *Monge*, 2023 WL 3571935, at *5 (quoting *Sciandra v. Lynett*, 187 A.2d 586, 588 (Pa. 1963)).  It is the plaintiff's burden to show that these conditions are not met.  *Sciandra*, 187 A.2d at 589.

*First*, as under New York law, the account of the official proceeding must be "substantial[ly] accura[te]."  *Sciandra*, 187 A.2d at 589.  Pennsylvania applies a similar test as New York for substantial accuracy:  "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth

---

[22] *See*, *e.g.*, *Monge*, 2023 WL 3571935, at *5–6; *I.M. Wilson, Inc. v. Otvetstvennostyou*, 500 F. Supp. 3d 380, 424 (E.D. Pa. 2020); *RiteScreen Co., LLC v. White*, 2024 WL 454945, at *5 (M.D. Pa. Feb. 6, 2024); *Abraham v. Greater New Castle Cmty. Fed. Credit Union*, 2016 WL 1161217, at *4 (W.D. Pa. Mar. 23, 2016); *King v. Phila. Inquirer*, 2007 WL 9813083, at *5–6 (E.D. Pa. Nov. 28, 2007); *Reilly v. N. Hills News Rec.*, 1998 WL 1113472, at *3 (W.D. Pa. Oct. 26, 1998).

[stated in the proceeding] would have produced." *Hudak v. Times Pub. Co.*, 534 F. Supp. 2d 546, 559 (W.D. Pa. 2008) (quoting *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)). "[I]f the statement is true in substance inaccuracies of expression or detail are immaterial." *WCAU-TV*, 555 F. Supp. at 202.

As explained above, the Report is a substantially accurate report of the allegations in the Nol Pros Motion as well as information from the nol-pros hearing and trial transcripts. *See supra* Part III.B.1. As under New York law, this first condition is clearly met. *See Mosley v. Observer Pub. Co.*, 629 A.2d 965, 970 (Pa. Super. 1993) ("Although the [reports] may have contained a sharp 'sting,' it is clear that their 'sting' or 'gist' was no greater than the information contained in the [proceeding] itself."); *First Lehigh*, 700 A.2d at 507 ("Clearly, because [defendants] practically copied portions of the [court document] in the [report], there is no different gist.").

*Second*, to defeat the Pennsylvania privilege, a plaintiff must demonstrate that the allegedly defamatory report was "published *solely* for the purpose of causing harm to the person defamed."[23] *Sciandra*, 187 A.2d at 589 (emphasis added). To evaluate this, courts read the report "in context." *I.M. Wilson*, 500 F. Supp. 3d at 423. McCaffery does not and cannot plausibly allege that the Report was published for the *sole* purpose of harming her, for several reasons.

**1.** As the Amended Complaint acknowledges, the Report expressly set forth *multiple* purposes—none of which pertain to McCaffery. Thus, as a matter of law, there was no *sole* purpose to harm her. As explained in Part II.D, the Report's broad purposes were to improve fairness in criminal justice and to advance public safety. Ex. G at 18. The Report did so by

---

[23] This is a key difference between the New York and Pennsylvania privileges. Whereas the New York privilege requires a plaintiff to allege and prove that the *underlying proceeding* was brought solely to later defame the plaintiff, *Branca*, 476 N.Y.S.2d at 189, the Pennsylvania privilege requires the plaintiff to allege and prove that the *report about the proceeding* was published solely for the purpose of harming the plaintiff, *Sciandra*, 187 A.2d at 589.

identifying common themes and factors contributing to misconduct at the DAO, and offering policy recommendations to mitigate future misconduct. *Id.* at 18–33.

Even with respect to the identification of prosecutors found to have engaged in misconduct, the Report stated multiple valid purposes for doing so. As the Amended Complaint acknowledges, the Report named such prosecutors for three reasons: (1) to help the public assess whether the DAO and its prosecutors are "upholding [their] ethical and constitutional obligations," (2) to counter "the public perception that prosecutors are not held accountable for their actions" and the consequent erosion of "community trust in the [DAO's] work," and (3) to help the DAO identify policy solutions, including the potential to "audit or scrutinize cases handled by these prosecutors." Ex. G at 9 & n.54; Am. Compl. ¶ 238 (referencing the "reason[s] behind this approach").[24] These legitimate functions further the Report's overarching purposes of promoting fairness and safety. Ex. G at 18; *see I.M. Wilson*, 500 F. Supp. 3d at 423–24 (claimant failed to plausibly allege that rival published summary of its pleadings "for the sole purpose" to harm where, "read in context," the summary explained the basis for its actions, notwithstanding the parties' obvious "acrimony").

**2.** The Report did not have the sole purpose to harm McCaffery because she was clearly not the sole focus of the Report. As the Amended Complaint concedes, the Report named "over 40 former prosecutors" accused of misconduct and allegedly had *multiple* "express *purposes* of outing [those] *prosecutors*." Am. Compl. ¶¶ 226, 372 (emphases added). Thus, by McCaffery's own account, the overwhelming majority of the Report was devoted to at least *39* other prosecutors, and only passingly dealt with McCaffery. Moreover, unlike the 18 ADAs featured prominently in the body of the Report, McCaffery was not mentioned at all in the Report's body,

---

[24] Courts recognize that identifying offending prosecutors' names can serve salutary purposes, including "serv[ing] as a unique tool to encourage compliance with a prosecutor's disclosure obligations." *DeLeon*, 428 F. Supp. 3d at 1134 (citing Gershowitz, 42 U.C. DAVIS L. REV. 1059).

and instead was only passingly referenced in two pages in the Case Appendix's summary of *Patterson*, which itself was only one of 52 case studies. Ex. G at 1, 4–32, 73–74. In sum, McCaffery clearly was not singled out in a publication solely intended to harm her. Rather, the *Patterson* case was just one data point among many in service of the Report's broad purposes to identify and prevent misconduct at the DAO. The plain text and context of the Report render it wholly implausible that the Report was published solely to harm McCaffery. *See Friedman*, 957 F. Supp. at 714–15 (no evidence that publication was made solely to harm plaintiff where "the article focused on seven people, not just plaintiff").

**3.** The Report's inclusion of four public statements by Sax, who defended his and McCaffery's prosecution and stated that "[e]verything" was properly disclosed, belies the notion that the Report's sole purpose was to harm her. Ex. G at 75. To publish a fair report, Defendants were "not required" to include any comment from Sax or McCaffery at all, let alone *four* quotes from Sax challenging the narrative. *First Lehigh*, 700 A.2d at 508. That Defendants did so confirms that the Report was fair and not solely intended to harm McCaffery.

Finally, the Amended Complaint's inflammatory allegations of Defendants' supposed bad faith do nothing to defeat the privilege other than distract. *See*, *e.g.*, Am. Compl. ¶¶ 152–178. For example, the impertinent (and baseless) accusation that Defendants violated CHRIA while researching the Report has no bearing on the fair-report privilege. *Id.* ¶ 155; *see Medico*, 643 F.2d at 147 ("How a reporter gathers his information concerning a judicial proceeding is immaterial provided his story is a fair and substantially accurate portrayal of the events in question.").

Accordingly, Pennsylvania's fair-report privilege, like New York's privilege, compels that the Amended Complaint's defamation claim be dismissed as a matter of law.

### D.    The Fair-Report Privileges Doom McCaffery's Remaining Claims

The New York and Pennsylvania fair-report privileges also defeat McCaffery's claims for

false light, intentional infliction of emotional distress ("IIED"), and civil conspiracy.

New York's privilege "provides that '[a] civil action cannot be maintained' based on privileged statements—regardless of whether that civil action is for defamation or [another claim]." *Wexler*, 374 F. Supp. 3d at 314 (quoting N.Y. Civ. Rights Law § 74). Where, as here, a defendant makes a fair report, related claims—such as "false-light" and "intentional and negligent infliction of emotional distress"—"[a]ll . . . merge in the defamation and do not give rise to any relief . . . based on separate legal theories." *Misek-Falkoff v. McDonald*, 177 F. Supp. 2d 224, 231–32 (S.D.N.Y. 2001), *aff'd*, 63 F. App'x 551 (2d Cir. 2003); *see also Misek-Falkoff v. Am. Law. Media, Inc.*, 752 N.Y.S.2d 647, 648–49 (App. Div. 2002) ("Civil Rights Law § 74 bars all of plaintiffs' claims," including false light and IIED). Thus, section 74 bars all of the claims.

The same is true of Pennsylvania's privilege. Where a defendant is "protected by Pennsylvania's fair report privilege," courts dismiss both "defamation . . . and false light claims." *Monge*, 2023 WL 3571935, at *6. Likewise, because McCaffery's "claims for emotional distress are based on the same conduct as her libel claims—which fail under the fair-report privilege—her emotional distress claims must also be dismissed."[25] *Lee*, 710 F. App'x at 561.

Last, "an allegation of civil conspiracy requires that a plaintiff allege a cause of action for

---

[25] The IIED claim fails for the additional reason that it does not allege sufficiently "extreme and outrageous" conduct to state a claim. *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (citation omitted). To qualify as extreme and outrageous, the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 754. Such conduct is present "only in the most egregious of situations, such as mishandling of a corpse, reckless diagnosis of a fatal disease, and having sexual contact with young children." *Cheney v. Daily News L.P.*, 654 F. App'x 578, 583–84 (3d Cir. 2016). Courts routinely dismiss IIED claims premised on publications, no matter how inflammatory. *See id.* (article reporting sex scandal); *Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172–73 (Pa. Super. 1988) (article reporting shooting incident). Here, the publication of an academic report relying on a years-old publicly filed motion does not come close to the "extreme and outrageous" conduct necessary for an IIED claim.

some underlying tortious conduct in order for the plaintiff's civil conspiracy claim to proceed." *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 418 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 594 (3d Cir. 2016). Here, McCaffery's "civil conspiracy claim must be dismissed . . . because the underlying torts [she] allege[s] are all legally deficient." *Id.*

### E.      The Anti-SLAPP Statute Entitles Defendants to Attorneys' Fees

Not only does the Amended Complaint fail as a matter of law, but it violates Pennsylvania's recently enacted Uniform Public Expression Protection Act, commonly known as an anti-SLAPP statute. 42 Pa. Cons. Stat. §§ 8340.11–.18. "Strategic lawsuits against public participation ('SLAPPs') are lawsuits filed to punish, silence, and intimidate defendants exercising their First Amendment rights." *Paucek v. Shaulis*, 349 F.R.D. 498, 509 (D.N.J. 2025); *see also* 42 Pa. Cons. Stat. § 8340.11 unif. l. cmt. The statute is to be given a "[b]road construction" to further "the public interest to encourage continued participation in matters of public significance," which "should not be chilled" through meritless claims. 42 Pa. Cons. Stat. § 8340.12(2)–(4).

One way the anti-SLAPP statute advances this interest is by imposing mandatory fee-shifting where a plaintiff's speech-chilling lawsuit lacks merit. *See id.* § 8340.18(a). As a substantive law, "state law creating or denying the right to attorneys' fees controls in a diversity action." *Sec. Mut. Life Ins. Co. of N.Y. v. Contemp. Real Est. Assocs.*, 979 F.2d 329, 332 (3d Cir. 1992).[26] Thus, the anti-SLAPP statute's "mandatory award of attorneys' fees is a substantive provision of state law" applicable in this federal diversity action. Michael Berry & Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough Anti-SLAPP Protections: The New Uniform*

---

[26] *See*, *e.g.*, *Chin v. Chrysler LLC*, 538 F.3d 272, 279 (3d Cir. 2008) (New Jersey attorneys' fees rule); *Hoelzle v. Vensure Emp. Servs., Inc.*, 2022 WL 3588025, at *1 (E.D. Pa. Aug. 22, 2022) (fee-shifting under Pennsylvania Wage Payment and Collection Law); *Hilferty v. Chevrolet Motor Div. of Gen. Motors Corp.*, 1996 WL 287276, at *3 (E.D. Pa. May 30, 1996) (fee-shifting under Pennsylvania Automobile Lemon Law).

*Public Expression Protection Act*, 96 PA. B.A. Q. 1, 22 (2025).[27]

The Court should award Defendants their fees here.  *First*, the anti-SLAPP statute applies to actions based on "protected public expression," 42 Pa. Cons. Stat. § 8340.14(a), which is defined to include the "exercise, on a matter of public concern, of the rights of freedom of speech or of the press," *id.* § 8340.13.  The Report "relat[es] to misconduct by government officials," which "clearly involves matters of public concern."  *Myers v. City of Wilkes-Barre*, 448 F. Supp. 3d 400, 414 (M.D. Pa. 2020).  Accordingly, this action falls within the scope of the anti-SLAPP statute.

*Second*, where a defendant prevails on a Rule 12(b)(6) motion, it is entitled to recover fees. If a defendant is "immune under section 8340.15 . . . the court *shall* award the party attorney fees, court costs and expenses of litigation."  42 Pa. Cons. Stat. § 8340.18(a)(1) (emphasis added). Section 8340.15, in turn, deems a defendant "immune" if the plaintiff fails to "state a cause of action upon which relief can be granted."  *Id.* § 8340.15(1)(ii).  Therefore, since McCaffery fails to state a claim, Defendants are immune and entitled to attorneys' fees.

Accordingly, under the anti-SLAPP law, Defendants are entitled to a mandatory award of attorneys' fees, costs, and expenses upon dismissal of this action pursuant to Rule 12(b)(6).

## IV.    CONCLUSION

The Amended Complaint fails to state a claim and should be dismissed.  And it should be dismissed with prejudice because, after amending her Complaint, McCaffery still cannot plausibly allege any facts that could overcome the New York or Pennsylvania fair-report privileges. Accordingly, Defendants respectfully request that the Court dismiss all claims with prejudice, and award them their fees, costs, and expenses under the anti-SLAPP statute.

---

[27] Fee-shifting under other states' similar anti-SLAPP laws also apply in federal court.  *See*, *e.g.*, *Paucek*, 349 F.R.D. at 513–19 (D.N.J. 2025); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 183–84 (S.D.N.Y. 2024); *GEICO v. Glassco Inc.*, 2021 WL 4391717, at *5 (M.D. Fla. Sept. 24, 2021).

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: ___/s/ Jeremy A. Chase_____
    Geoffrey S. Brounell
    Jeremy A. Chase (*pro hac vice*)
    Raphael Holoszyc-Pimentel (*pro hac vice*)
    Alexandra Perloff-Giles (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8230
geoffreybrounell@dwt.com
jeremychase@dwt.com
rhp@dwt.com
alexandraperloffgiles@dwt.com

*Attorneys for Defendants New York University
School of Law and New York University*

Dated: September 5, 2025

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By: ___/s/ John S. Summers_____
    John S. Summers
    Jason A. Levine
    Nicholas J. Bellos
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
jsummers@hangley.com
jlevine@hangley.com
nbellos@hangley.com

*Attorneys for Defendant Patricia Cummings*